MEMORANDUM
 

 WOODLOCK, District Judge.
 

 I.
 

 A conservationist contends that several officials of the Commonwealth of Massachusetts have violated the Endangered Species Act (“ESA”) and the Marine Mammal Protection Act (“MMPA”) by authorizing the use of “gillnets”
 
 [1]
 
 and “lobster gear”
 
 [2]
 
 by commercial fishing boats in Massachusetts waters, including areas designated as a “critical habitat” for the endangered Northern Right whale, and by allowing whale-watching ships to approach whales closely. Defendants move to dismiss and/or for summary judgment. Plaintiff seeks a preliminary injunction and a temporary restraining order.
 

 Plaintiff has shown a sufficient likelihood that endangered whales are periodically “taken” through entanglements with gillnets and lobster gear in waters regulated by the Defendants, who have not obtained an ESA or MMPA incidental take permit from the National Marine Fisheries Service (“NMFS”).
 
 [3]
 
 Because this showing is sufficient, I have denied the Defendants’ motion for summary judgment on Count
 
 [4]
 
 1, which alleges a violation of Section 9 of the ESA through entanglements in gillnets and lobster gear. In addition, I have denied the Defendants’ motion for summary judgment on Count II, which alleges a “taking” through habitat modification. But because Plaintiff has no cause of action under the MMPA, I have granted the motion to dismiss Count III. Finally, I have granted the Defendants’ motion for summary judgment on Count IV, which alleges a violation of Section 9 through pursuit and harassment by whale-watch vessels, because there is no indication that Defendants will repeat their conduct of 1989, when they allowed approaches closer than 500 yards
 
 [5]
 
 and because the Plaintiff has not established that whales are harmed by approaches at 500 yards or more.
 

 Having found a likelihood of success by Plaintiff on Counts I and II and an adequate showing of harm for purposes of the ESA, I will also fashion interlocutory injunctive relief although as detailed
 
 infra,
 
 the relief differs from that sought by the Plaintiff.
 

 II.
 
 Procedural History
 

 The Plaintiff, Richard Max Strahan, the national campaign director of GreenWorld,
 
 [6]
 
 
 *966
 
 filed this complaint on April 21,1995 alleging four counts
 
 [7]
 
 of violations of the ESA and the MMPA. Three defendants are named in the complaint: Trudy Coxe, Secretary of the Massachusetts Executive Office of Environmental Affairs (EOEA); John Phillips, Commissioner of the Massachusetts Department of Fisheries, Wildlife, and Environmental Law Enforcement (DFW); and Philip Coates, Director of the Massachusetts Division of Marine Fisheries (DMF).
 

 On May 9, 1995, Strahan filed an Application for a Temporary Restraining Order (TRO) and Motion for a Preliminary Injunction. The defendants moved to dismiss or in the alternative for summary judgment.
 

 On June 15, 1995, I held a hearing on the application. At this hearing, I addressed a number of issues. First, concerning jurisdiction, Strahan asserted that he had provided the requisite notice to the Secretary of Commerce approximately two years before filing this suit of his intent to sue. I instructed Strahan to file an affidavit that he had, in fact, provided such notice.
 
 [8]
 
 *Second, regarding Strahan’s standing to bring suit, I held that I would take judicial notice of Strahan’s statements during his deposition in another case involving the Northern Right whale,
 
 Strahan v. Linnon,
 
 slip op., No. 94-11128-DPW (as corrected May 19,1995), unless the Defendants filed an objection by June 21, 1995.
 
 [9]
 
 Third, I also directed Strahan to file affidavits and other supporting documents regarding his allegations of Northern Right whale entanglement in fixed fishing gear.
 
 [10]
 

 I subsequently allowed a motion of the Conservation Law Foundation, Inc. (CLF) for leave to file an amicus curiae brief in this case. In its amicus curiae brief, CLF attached affidavits from Charles Mayo,
 
 [11]
 
 David
 
 *967
 
 Mattila,
 
 [12]
 
 and Eleanor Dorsey
 
 [13]
 
 regarding the impact of fixed fishing gear on Northern Right whales and recommendations to reduce this impact.
 
 [14]
 
 Strahan thereafter moved for these amicus curiae affidavits to be re-entered into the record on his behalf. I allowed that motion.
 

 At a status conference held on March 13, 1996, Strahan submitted a second application for a TRO and moved for an emergency preliminary injunction enjoining the defendants from issuing any new permits in Cape Cod Bay until June 1, 1996, and from revoking any existing permits. At this conference, I also directed the Defendants to submit affidavits detailing any efforts that they have undertaken regarding the Northern Right whale.
 
 [15]
 
 By endorsements on March 29, 1996,1 granted in part and denied in part the Defendants’ motions to dismiss and for summary judgment and noted that I could not grant a preliminary injunction in the form sought by Plaintiff. I indicated that a memorandum of decision would follow. This is that Memorandum.
 

 At a status conference on April 12, 1996,1 solicited statements from the Defendants regarding interim measures which could be taken to provide further protections to the whale populations and established a briefing schedule for additional submissions, in light of Supreme Court developments regarding the Eleventh Amendment. I heard argument principally on the Eleventh Amendment issue on May 21, 1996, and received a number of submissions thereafter.
 

 The development of this case has been extremely difficult in large part because of Plaintiffs
 
 pro se
 
 status. Unlike the companion
 
 Linnon
 
 litigation,
 
 see
 
 note 16
 
 infra,
 
 where Plaintiff is now assisted by very competent counsel and orderly ease management has been possible, here the Plaintiffs solo involvement has complicated matters considerably. The Plaintiff, while pressing a case which I find to have significant merit, is a highly aggressive and abrasive individual whose conduct has generated a number of complaints and requests by Defendants for sanctions against him. I have sought to avoid being distracted by such ancillary matters in order to address the merits of the case. Nevertheless, I am sorely aware that the Plaintiffs claims raise the prospect of substantial disruption to the fishing industry in Massachusetts and that Plaintiff is not by training or disposition capable of accommodating competing views. Consequently, I have moved diffidently in attempting to shape a means for framing and resolving this matter. The interlocutory injunctive relief detailed herein is designed to formalize and advance the necessary conversations which must take place to resolve the claims presented here.
 

 III.
 
 Factual and Regulatory Background
 

 Strahan, an officer of GreenWorid, Inc., brings suit “on behalf of’ the Northern Right whale
 
 (Eubalaena
 
 glacialis); the Humpback whale
 
 (.Megaptera
 
 novaeangliae); the Fin or Finback whale
 
 (Balaenoptera
 
 physalus); the Blue whale
 
 (Balaenoptera
 
 musculus); the Sei whale
 
 (Balaenoptera
 
 borealis); the Minke whale
 
 (Balaenoptera
 
 acutorostrata); and the Harbor porpoise
 
 (Phocoena phocoena
 
 ).
 
 [16]
 
 With the exception of the Minke whale, all of the whales on this list have been listed as endangered species by the federal government.
 
 See
 
 50 C.F.R. § 222.23(a). In 1993, NMFS proposed to list the Gulf of Maine population of the Harbor porpoise as
 
 *968
 
 “threatened.” 58 Fed.Reg. 3,108 (Jan. 7, 1993). The Complaint and other submissions focus on the Right whale, and briefly describe injuries to Humpback, Fin and Blue whales.
 

 A.
 
 Whales in Massachusetts Waters: Population and Behavioral Patterns
 

 1.
 
 Right Whales
 

 Right whales are the most endangered of the large whales, despite the fact that they have been protected from commercial whaling since 1935.
 
 See Final Rule: Designated Critical Habitat; Northern Right Whale,
 
 59 Fed.Reg. 28,793 (1994) (NMFS);
 
 cf. Proposed Rule: Designated Critical Habitat; Northern Right Whale,
 
 58 Fed.Reg. 29,186 (1993).
 
 [17]
 
 There are only approximately 300 to 350 individual Right whales in the western North Atlantic, and the eastern North Atlantic population may be nearly extinct. 59 Fed.Reg. 28,793. Many human activities can disrupt the Right whale, including vessel activities, commercial fishing, and pollution. 59 Fed.Reg. 28,796-97.
 

 The vast majority of Northern Right whales are present in Massachusetts waters only during spring feeding. The whales “spend the spring and early summer off the coast of New England, then in the latter part of the summer and fall, move to the waters off southern Canada.” (NMFS, Right Whale Recovery Plan, TRO Ex. 1 at 5.)
 

 [During] March to May most sightings are in the Cape Cod-Massachusetts Bay area and the [Great] South Channel on the western edge of the Georges Bank. Feeding activity is the most [frequently] seen behavior at this time. Differences in distribution observed each year are ... due to prey abundance. It has been suggested that most of the northern right whale population moves through this area en route to summer feeding grounds to the north.
 

 TRO Ex. 1 at 6 (citation omitted) (brackets used where portions of text have been obscured). With the exception of the summer of 1986, “[n]orthern right whales are rarely present in Cape Code Bay after May 15.”
 
 Id.
 
 at 10.
 

 In an “Executive Summary” submitted to the Massachusetts legislature, the Defendants offered the following explanation of the “Importance of Massachusetts Waters to the Northern Right Whale”:
 

 • Approximately half of all known right whale calves in the North Atlantic use Massachusetts waters sometime in their first year of life. They are usually brought to Massachusetts in the spring when they are between 3 and 6 months old.
 

 • Between 13% and 20% of all known North Atlantic right whales (31 to 49 individuals) were documented in the Massachusetts region annually between 1983 and 1986.
 

 • At least 117 different right whales have been identified in the Massachusetts Region since 1975. This represents about half of all individuals identified in the North Atlantic Right Whale Catalogue.
 

 • Right whales remained in Massachusetts waters an average of 16.5 days (range of 1 to 84 days) in the years 1983 to 1985. In 1986 an apparent change in food availability increased the average residence time to 38 days (range of 1 to 101 days).
 

 • The primary importance of Massachusetts waters, particularly around Cape Cod Bay, appears to be as a feeding area. In most years there is a seasonal peak in abundance in April, with substantial numbers also occurring in March and May.
 

 (Right Whales in Massachusetts Waters, An Executive Summary, TRO Ex. 6 at 2.)
 
 [18]
 

 
 *969
 
 2.
 
 Humpback Whales
 

 Humpback whales “are probably the fourth most numerically depleted large cetacean worldwide,” behind the Right, Blue, and Bowhead whales. National Marine Fisheries Service, Recovery Plan for the Humpback Whale at 1 (1991) (hereinafter “Humpback Whale Recovery Plan”). The Western North Atlantic population of Humpback whales is approximately 5,505 in number.
 
 See
 
 Approaching Marine Mammals, 57 Fed.Reg. 34,101, 34,102 (proposed Aug. 3, 1992);
 
 cf.
 
 Humpback Whale Recovery Plan at 16. On the East Coast:
 

 Humpback whales regularly inhabit [U.S. waters] during spring, summer and autumn. They feed opportunistically all along the continental shelf, but the largest numbers occur from mid-April to mid-November in the western section of the Gulf of Maine, particularly the Great South Channel, Stellwagen Bank and Jeffreys Ledge; and also from July through October in the eastern section around the mouth of the Bay of Fundy.
 

 Humpback Whale Recovery Plan at 13 (citation omitted).
 

 3.
 
 Fin Whales
 

 NMFS has offered the following summary of Fin whale status:
 

 Although the status of the stocks of fin whales is unknown, it is believed to be depleted relative to historic levels, but abundant relative to other large whale species. The total world population size is about 120,000. However, no similar population exists in U.S. waters. Fin whales are included in the species of large whales that are the object of whale watching activities on Stellwagen Bank in Massachusetts Bay. Avoidance behavior by fin whales, defined as erratic changes in course, speed, behavior or respiratory rhythm, has been shown to be associated with vessel activity in Cape Cod and Massachusetts Bay.
 

 Approaching Marine Mammals, 57 Fed.Regs. 34,101, 34,102 (proposed Aug. 3,1992). Strahan has not submitted any material concerning the Fin whale population, or the seasons in which Fin whales may be found in Massachusetts waters.
 

 4.
 
 Blue Whales
 

 The Humpback Whale Recovery Plan suggests that Blue whales are more numerically depleted than Humpbacks. Humpback Whale Recovery Plan at 1. Strahan has not provided any other information concerning the population of Blue whales or their presence in Massachusetts waters. NMFS did not estimate the minimum population of the Blue whales in its draft stock assessments for marine mammals.
 
 See
 
 Marine Mammals, 59 Fed.Reg. 40,527 (Aug. 9,1994).
 

 5.
 
 Sei Whales
 

 Strahan has not provided any information concerning the population of Sei whales and whether they visit Massachusetts waters.
 

 6.
 
 Minke Whales
 

 The Minke whale has not been listed as endangered or threatened. As will be discussed below, Strahan’s only cause of action lies under the ESA, which does not cover the Minke whale.
 

 7.
 
 Harbor Porpoise
 

 NMFS has proposed that the Harbor Porpoise be listed as “threatened.” 58 Fed.Reg. 3,108 (Jan. 7, 1993). Section 9 of the ESA does not protect “threatened” species, only “endangered” species.
 
 See
 
 16 U.S.C. § 1538(a)(1)(B) (unlawful to take any endangered species, listed under 16 U.S.C. § 1533, within the United States or the territorial sea of the United States). Consistent with its authority under Section 4(d) of the ESA, 16
 
 *970
 
 U.S.C. § 1533(d),
 
 [19]
 
 the Fish and Wildlife Service (FWS) has expanded Section 9 to protect “threatened” species as well as “endangered” species.
 
 See
 
 50 C.F.R. § 17.31(a) (with certain exceptions, “all of the provisions in § 17.21 [which includes prohibitions on takings] shall apply to threatened wildlife”).
 
 [20]
 
 It does not appear that NMFS has issued a similar regulation. In 1990, NMFS rejected a suggestion from the Department of the Interior that it do so, stating:
 

 The prohibitions in section 9 and exceptions in section 10 of the ESA apply only to endangered species of fish and wildlife. When a species is listed as threatened, protective regulations must be issued under section 4(d) of the ESA to provide for the conservation of the species. These regulations can establish the same requirements for threatened species as the ESA provides for endangered species or they can be less restrictive, as appropriate. Therefore, making these regulations apply to all threatened marine species is not appropriate.
 

 Permits for Incidental Taking of Endangered Marine Species, 55 Fed.Reg. 20,603, 20,603-04 (May 18, 1990).
 
 See
 
 50 C.F.R. pt. 227 for NMFS regulations for threatened species of marine mammals and reptiles.
 
 Cf
 
 Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions, 59 Fed.Reg. 34,272 (July 1, 1994) (NMFS and FWS) (“Under the [ESA] and regulations, it is illegal for any person ... to take ... any endangered fish or wildlife species and
 
 most
 
 threatened fish and wildlife species.”) (emphasis added).
 

 In addition, although NMFS has proposed that the Harbor porpoise be listed as threatened, the porpoise has not yet been so listed,
 
 cf
 
 Proposed Rule Stage, 60 Fed.Reg. 23,-160, 23,180 (proposed May 8, 1995) (NMFS) (proposed designation of critical habitat for Gulf of Maine population of Harbor porpoise) (noting “[t]he listing has not been made final to date”); 16 U.S.C. § 1533(a)(2).
 
 [21]
 
 Thus, Strahan has not stated an ESA claim on behalf of the Harbor porpoise.
 

 B.
 
 Federal Efforts to Protect the Whales
 

 Endangered whales, such as Right, Humpback, Fin, and Blue whales, are protected by the Endangered Species Act and by the Marine Mammal Protection Act. Both Acts prohibit the “taking” of endangered whales.
 
 See
 
 16 U.S.C. § 1538(a)(1)(B) (ESA); 16 U.S.C. § 1372(a)(2)(A) (MMPA). The ESA defines “take” as “harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct.” 16 U.S.C. § 1532(19). The MMPA defines “take” as “harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal.” 16 U.S.C. § 1362(13).
 

 As offices within the Department of the Interior and the Department of Commerce, respectively, the United States Fish and Wildlife Service (“FWS”) and the National
 
 *971
 
 Marine Fisheries Service (which is part of the National Oceanic and Atmospheric Administration (“NOAA”)) share responsibilities under the MMPA and ESA.
 
 See
 
 16 U.S.C. §§ 1532(15), 1540 (ESA); 16 U.S.C. §§ 1362(12), 1377 (MMPA); Marine Mammal Protection Act Amendments of 1994, S.Rep. No. 220,103d Cong., 2d Sess. 2,
 
 reprinted in
 
 1994 U.S.C.C.A.N. 518, 519; Incidental Take of Endangered, Threatened and Other Depleted Marine Mammals, 54 Fed.Reg. 40,338 (1989). “NMFS is responsible for species of the order Cetacea (whales and dolphins) and the suborder Pinnipedia (seals and sea lions) except walrus. FWS is responsible for the dugong, manatees, polar bear, sea and marine otters and walrus.” 54 Fed.Reg. at 40,338 (1989);
 
 see also
 
 16 U.S.C. § 1362(12). Consistent with its responsibilities under the ESA and MMPA, NMFS is involved in various efforts to protect endangered whales.
 

 1.
 
 Interim Commercial Fishing Permits
 

 NMFS recently published notice in the Federal Register that it would not issue interim incidental taking permits to vessels engaged in certain fisheries for the Western North Atlantic stock of the Northern Right, Humpback, and Fin whales.
 
 Taking of Threatened or Endangered Marine Mammals Incidental to Commercial Fishing Operations; Interim Permit,
 
 60 Fed. Reg. 45,399 (NMFS) (Aug. 31, 1995). This was because NMFS could not find that the incidental takings of these species would have a negligible impact on their survival.
 
 Id.
 
 As a result, “[n]o takes of these endangered or threatened marine mammal stocks [including the right, humpback, and fin whales] incidental to commercial fishing are allowed.”
 
 Id.
 

 2.
 
 Recovery Plans
 

 The ESA requires that “[t]he Secretary shall develop and implement [recovery] plans ... for the conservation and survival of endangered species and threatened species ... unless he finds that such a plan will not promote the conservation of the species.” 16 U.S.C. § 1533(f)(1).
 

 In 1991, a Recovery Plan for the Northern Right whale was prepared for NMFS. (TRO Ex. 1 (hereinafter “Right Whale Recovery Plan”)). NMFS adopted the plan on March 13, 1992. 57 Fed.Reg. 8,862 (Mar. 13, 1992). NMFS also approved a Recovery Plan for the Humpback whale at the same time,
 
 see
 
 57 Fed.Reg. 8,862; Humpback Whale Recovery Plan. It does not appear that a Recovery Plan has been prepared for the Fin, Blue or Sei whales.
 

 The Right Whale Recovery Plan explains the danger from fishing gear as follows:
 

 Since 1975, twelve encounters with fishing gear have been recorded in the western North Atlantic. Analyses of photographic data from the New England Aquarium’s photographic catalog show that 58 percent of the catalogued northern right whales have scars and injuries around the tail stock indicative of rope and net cuts. Photographs of one whale that had netting wrapped around its tail stock for more than 4 years illustrate the extensive chafing and scarification which is characteristic of entanglement survivors. Entanglement and entrapment in gillnets and lines from lobster pots, seines, and fish weirs have been recorded. Three whales are known to have died from entanglements. However, one whale, Stars, lost the rope that had been caught in her baleen from 1987-1990 and gave birth to a calf in 1991.
 

 Right Whale Recovery Plan at 11 (citations omitted).
 

 The Humpback Whale Recovery Plan also describes entanglements as a threat:
 

 Entrapment and entanglement in active fishing gear is the most frequently identified source of human-caused injury or mortality to humpback whales. Humpback whales are large enough to break through netting before becoming entangled, but they occasionally entangle in the lead or anchor ropes which they cannot break. Drowning or starvation may result if humans do not intervene to free the whales____
 

 The most significant known entanglement problem occurs in northeastern continental shelf waters around Newfoundland, Canada, where humpbacks are entrapped during June and July in traps and gillnets set for cod; and gillnets for salmon, lumpfish, herring, and various groundfish. The
 
 *972
 
 numbers of humpbacks entrapped per year have ranged from 26 to 68____
 

 From 1976-1986, the NMFS Northeast Fisheries Laboratory reported 18 humpback whale entanglements in fishing gear in northeastern U.S. continental shelf waters. Gillnets caused 39% of the entanglements; other gear included unspecified ropes and lines, scallop gear, and seine gear. Nine animals were freed by volunteers, 6 were known to have died, and 3 were never resighted after disappearing with gear on them.
 

 Humpback Whale Recovery Plan at 25 (citations and scientific names omitted).
 

 Because “entanglement is a major cause of injury and mortality in northern right whales,” one objective of the Right Whale Recovery Plan is to “[rjeduce or eliminate injury and mortality caused by fisheries and fishing gear.”
 
 Id.
 
 at 24. The Right Whale Recovery Plan suggests that:
 

 Guidelines, restrictions or prohibitions on types or placement of fishery gear should be considered on a regional and temporal basis to nunimize or eliminate their impact on northern right whales. Current evidence indicates that gillnets are the predominant fishing gear found in all high-use areas that pose an entanglement threat to northern right whales. Offshore lobster pot fishing gear in the Bay of Fundy could also be a new threat to northern right whales. These fisheries should be restricted during the period when northern right whales are likely to be present.
 

 Right Whale Recovery Plan at 24. For the Cape Cod and Massachusetts Bays in particular, the Right Whale Recovery Plan states:
 

 Gillnets are common and have trapped northern right whales and other whale species. These nets threaten northern right whales from March to May, after which whales and nets may be more scattered. Regulations to restrict the use of gillnets during periods of high northern right whale use of these waters is a high priority....
 

 Id.
 
 at 25.
 

 The Right Whale Recovery Plan also specifies that collisions with ships are a significant cause of whale mortalities.
 
 Id.
 
 at 9-10. There is less certainty, however, concerning “the effects of vessel disturbance on either individual animals or segments of the population.”
 
 Id.
 
 at 10.
 

 Observations ... in the Cape Cod Bay area indicated that northern right whales usually did not react to low amplitude engine noise or minor vessel maneuvering. Northern right whale responses to vessels are apparently dependent on the behavior in which they are engaged. Courtship and surface feeding are examples of behaviors during which northern right whales appear unresponsive to the approach of boats. Cows with calves and single long-diving whales appear to be more sensitive to sound, and have been observed to avoid boats.
 

 Northern right whale areas in the Great South Channel and Bay of Fundy are located in or near shipping lanes. The effects of interactions in these areas are not documented. However, despite the extreme harassment and hunting during the historic exploitation period, right whales were observed returning to the same areas.
 

 Right Whale Recovery Plan at 10 (citations omitted);
 
 see also
 
 Humpback Whale Recovery Plan at 29 (indicating that effect of vessel operations is uncertain).
 

 3.
 
 Approach Distances
 

 The ESA gives the Secretary of Commerce authority “to promulgate such regulations as may be appropriate to enforce this Act,” 16 U.S.C. § 1540(f). One method that NMFS has employed to protect endangered whales is the establishment of minimum approach distances.
 

 a.
 
 Humpback Whales
 

 NMFS’ earliest efforts to create a minimum approach distance were directed at the Humpback whale. NMFS reviewed its efforts in 1992:
 

 In 1979, NMFS issued a Notice of Interpretation of harassment for humpback whales in Hawaii and defined harassment as substantial disruption of whale behavior. Inclusion of distance limits was seen as a compromise for enforcement purposes.
 
 *973
 
 However, by 1985, the Notice was losing its effectiveness as an enforcement tool because harassment cases were difficult to prosecute. Enforcement agents had to document substantial disruption of normal whale behavior patterns. In response to the problem of enforcing the Notice, NMFS published an interim rule that includes a 100-yard minimum approach distance to humpback whales and a 300-yard minimum distance for areas that have been designated as cow/calf pair areas. The whale watching industry in Hawaii continues to grow, and NMFS has successfully prosecuted cases of harassment since the interim rule went into effect. Although the continued growth of the thrillcraft industry in an area where humpback whales breed is cause for concern, NMFS enforcement agents believe that several highly publicized eases (one involving an $11,000 civil penalty) has actually reduced the general level of harassment of humpback whales.
 

 Approaching Marine Mammals, 57 Fed.Reg. 34,101, 34,102 (proposed Aug. 3, 1992).
 
 See also
 
 Interim Rule, Approaching Humpback Whales in Hawaiian Waters, 52 Fed.Reg. 44,912 (Nov. 23, 1987) (codified at 50 C.F.R. § 222.31 (1994)). By contrast, NMFS recommended a 100 foot approach limit for Humpback whales in New England waters, explaining that the North Atlantic population of Humpback whales was “at or above its initial (pre-exploitation) population size,” and that Humpback whales off Cape Cod appeared to have “acclimated to the presence of vessels.” 52 Fed.Reg. at 44,913.
 

 As part of the Marine Mammal Protection Act Amendments of 1994, Congress modified the NMFS approach limit as follows:
 

 In waters of the United States surrounding the State of Hawaii, it is lawful for a person subject to the jurisdiction of the United States to approach, by any means other than an aircraft, no closer than 100 yards to a humpback whale, regardless of whether the approach is made in waters designated under section 222.31 of title 50, Code of Federal Regulations, as cow/ealf waters.
 

 Pub.L. No. 103-238,108 Stat. 532, 559 (1994). Congress also terminated subsection (b) of 50 C.F.R. § 222.31, which set approach limits in cow/calf waters.
 
 Id.
 
 NMFS issued a final rule implementing these changes on January 19,1995. Approaching Humpback Whales in Hawaiian Waters, 60 Fed.Reg. 3,775 (1995); 50 C.F.R. § 222.31.
 

 b.
 
 Right Whales
 

 On December 27, 1994, NMFS issued an advance notice of proposed rulemaking to solicit public comment on a petition by GreenWorld to establish a 500 yard “protection zone” around every Right whale and a 100 yard “protection zone” around other whales.
 
 North Atlantic Right Whale Protection,
 
 59 Fed.Reg. 66,513, 66,514 (1994). On March 3, 1995, NMFS reopened the period for public comment until April 3, 1995. North Atlantic Right Whale Protection, 60 Fed.Reg. 11,951 (1995). On May 8, 1995, NMFS published another advance notice of proposed rulemaking concerning the protection zone. 60 Fed.Reg. 23,160, 23,184 (1995). On August 7, 1996, NMFS filed for publication in the Federal Register a proposed rule to prohibit all approaches within 500 yards of Northern Right whales, whether by vessel, aircraft, or other means. Written comments must be received by November 5, 1996. 61 Fed.Reg. 41,116 (Aug. 7,1996).
 

 c.
 
 All Whales
 

 In 1992, NMFS issued a proposed rule setting a minimum approach distance of 100 yards for all whales and 50 yards for dolphins and porpoise. Approaching Marine Mammals, 57 Fed.Reg. 34,101, 34,103 (proposed Aug. 3,1992). NMFS explained:
 

 NMFS believes the public can benefit from seeing marine mammals in their natural environment; however, the public must be aware that these animals, especially whales, are vulnerable to injury and disturbance by people, vessels and aircraft. Many whales are slow-moving, can escape only by diving, and in some regions are distributed in limited areas. Vessel traffic may subject whales to impacts ranging from displacing cow/calf pairs from near-shore waters to expending increased ener
 
 *974
 
 gy when feeding is disrupted or migratory paths rerouted.
 

 57 Fed.Reg. at 34,101.
 

 NMFS withdrew its proposal for a general approach limit in March of 1993. 57 Fed. Reg. 16,519 (Mar. 29, 1993). On April 26, 1993, NMFS indicated that it would be issuing a final rule establishing a minimum approach distance in May of 1993, 58 Fed.Reg. 24,152, 24,155. In June of 1994, however, NMFS announced that it was not considering broad-based whale watching regulations but only minimum approach distance specific to Northern Right whales. 59 Fed.Reg. 28,993, 28,800 (June 3,1994).
 

 4.
 
 Critical Habitats
 

 The ESA specifies that the appropriate Secretary, “to the maximum extent prudent and determinable ... shall, concurrently with making a determination ... that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat....” 16 U.S.C. § 1533(a)(3). Designation of a critical habitat “provides notice to Federal agencies and the public that a listed species is dependent on these areas and its features for its continued existence____”
 
 Id.;
 
 59 Fed.Reg. 28,793 (1994). Designation of a critical habitat relates to the consultation duties of federal agencies under Section 7 of the ESA.
 
 See
 
 16 U.S.C. § 1536(a). Usually, it has no direct effect on private entities or state agencies.
 

 On June 3,1994, NMFS designated a critical habitat for the Northern Right whale in portions of the Cape Cod Bay, the Stellwagen Bank, the Great South Channel, and in the Southeast United States.
 
 See
 
 59 Fed. Reg. 28,793, 28,797-28,798 (1994). There is no indication on the record that NMFS has designated a critical habitat in Massachusetts waters for the Humpback, Blue, Fin, or Sei whales.
 

 C.
 
 The Role of the Defendants
 

 1.
 
 General Responsibilities
 

 Chapter 130 of the Massachusetts General Laws vests the Division of Marine Fisheries (“DMF”) with broad authority to regulate fishing in the coastal waters of the Commonwealth. Pursuant to this authority, DMF requires that virtually all commercial fishing vessels receive a permit from DMF before they may take fish, including shellfish, from coastal waters.
 
 See
 
 322 C.M.R. §§ 7.01-7.05, 8.08.
 

 According to Defendant Coates:
 

 The marine fishery jurisdiction of the Commonwealth extends to those waters within an area encompassed by the shoreline of Massachusetts, in the case of bays a straight baseline from shore to shore, extending three nautical miles out to sea. Included in this area are all the waters of the Nantucket Sound.
 

 Federal authority over marine fishery resources beyond three miles is exercised by the National Marine Fisheries Service (NMFS).
 

 (Coates Aff. ¶¶ 5-6.)
 
 See also
 
 Mass.Gen.L. ch. 130, § 1 (defining “coastal waters” as “all waters of the commonwealth within the rise and fall of the tide and the marine limits of the jurisdiction of the commonwealth, but not waters within or above any fishway or dam”); 322 C.M.R. § 8.02 (coastal fisheries conservation and management) (defining “coastal waters” as “those waters which lie three geographical miles from the shoreline”).
 

 DMF is a division of the Department of Fisheries, Wildlife and Environmental Law Enforcement, which is part of the Executive Office of Environmental Affairs (“EOEA”).
 
 See
 
 Mass.Gen.L. eh. 21A, §§ 2, 7, 8. The Department of Fisheries, Wildlife and Environmental Law Enforcement also contains the Division of Law Enforcement and the Division of Fisheries and Wildlife.
 
 See
 
 Mass. Gen.L. ch. 21, §§ 6, 7. According to Defendant Coates, the Division of Law Enforcement “has authority to enforce the statutes and regulations governing marine fisheries,” (Coates Aff. ¶ 4), and the Division of Fisheries and Wildlife “has authority over all endangered species of Massachusetts including marine mammals,” (Coates Aff. ¶3).
 
 Cf.
 
 Mass.Gen.L. ch. 21, § 6A (duties of division of law enforcement).
 

 2.
 
 Gillnets and Lobster Gear
 

 The Division of Marine Fisheries has limited the use of gillnets and lobster gear in
 
 *975
 
 certain areas.
 
 See
 
 322 C.M.R. § 4.09 (use of gillnets south and west of Cape Cod), § 4.11 (use of gillnets in Massachusetts Bay), § 4.13 (fixed gear marking and maximum length requirements), § 6.13 (lobster trap limit), § 8.10 (fixed gear restrictions). DMF has set a maximum total continuous length of 24,000 feet for gillnets and 2,000 feet for lobster pot trawls.
 
 See
 
 322 C.M.R. § 4.13(3).
 

 In 1994, in response to the alarming depletion of the Harbor porpoise, DMF ordered that all sink gillnets be removed from coastal waters north of Cape Ann every November and from the Massachusetts Bay and Cape Cod Bay every March. DMF Rules Update (Nov. 2,1994), TRO Ex. 7.
 

 3.
 
 Right Whale Buffer Zone
 

 DMF has established a 500-yard “buffer zone” for Northern Right whales in Massachusetts waters. 322 C.M.R. §§ 12.00— 12.05 (1993). Strahan claims, without providing any supporting evidence thereof, that Defendants have refused to enforce the buffer zone regulation. (Amended Mem. at 11 n. 2). In any event, the Eleventh Amendment bars suits in federal court alleging violations of state laws by state officials.
 
 See Pennhurst State School & Hospital v. Halderman,
 
 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Moreover, this claim was not raised in the Complaint. Thus, I do not consider it in ruling on the pending motions.
 

 4.
 
 Whale Watch Vessels
 

 Neither DMF nor any agency in the Executive Office of Environmental Affairs regulates the general activities of whale-watch vessels. (Coates Aff. ¶ 10.) Strahan claims, however, that whale watch vessels have been granted an exemption from the buffer zone requirement and allowed to approach to “a distance of at least 100 feet.” (Complaint ¶ 65;
 
 see also
 
 Amended Complaint ¶ 65 (“to within a distance of 100 feet”).) Coates admits he has “issued a limited number of scientific research permits to some whale watch vessels exempting them from the 500 yard buffer zone surrounding right whales for scientific research purposes upon application.” (Coates Aff. ¶ 11.) Strahan alleged, in his Complaint, that “[t]he authorization of the pursuit of Northern Right Whales by Defendants to the Dolphin Fleet, resulted in the death of a baby whale in September of [1989] from being struck by vessels and injured by propellers.” (Complaint ¶ 65;
 
 see also
 
 Amended Complaint ¶ 65.) Strahan acknowledges, however, that “the Defendants has [sic] yet to issue any subsequent permits____” (Complaint & Amended Complaint ¶ 65.)
 

 IV.
 
 Jurisdiction and Standing
 

 I must address the preliminary matters of jurisdiction and standing in detail before turning to the substance of the Defendants’ motion for summary judgment and Strahan’s motion for a preliminary injunction.
 

 A.
 
 Private Rights of Action
 

 The first question to be answered is whether the complaint states a cause of action which may be maintained by a private party. Strahan claims violations of the Endangered Species Act and the Marine Mammal Protection Act. There is no citizen suit provision under the MMPA, and the Administrative Procedure Act (“APA”), 5 U.S.C. § 701
 
 et seq.,
 
 does not apply to state officials such as the Defendants.
 
 See
 
 5 U.S.C. § 701(b)(1) (“‘agency’ means each authority of the Government of the United States ... ”). Thus, Strahan’s claims under the MMPA, which are raised in Count III of his Complaint, must be dismissed for lack of jurisdiction.
 

 The ESA, by contrast, expressly authorizes citizen suits for injunctive relief. With certain exceptions,
 

 any person may commence a civil suit on his own behalf — (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof----
 

 16 U.S.C. § 1540(g)(1);
 
 see also
 
 16 U.S.C. § 1540(c).
 

 B.
 
 Notice of Suit
 

 One of the prerequisites to an ESA citizen suit is that the appropriate Secretary be given notice and the opportunity to initiate
 
 *976
 
 an enforcement action before a citizen suit is filed.
 
 See
 
 16 U.S.C. § 1540(g)(2)(A)(i). The rule provides that no suit may be commenced “prior to sixty days after written notice of the violation has been given to the Secretary [of Commerce or of the Interior], and to any alleged violator of any such provision or regulation[.]” The only exception to this requirement is for situations involving “an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants.” 16 U.S.C. § 1540(g)(2)(C). In such cases, suit may be brought “immediately”
 
 after
 
 the Secretary has been given notice.
 
 Id.
 

 Strahan has submitted an unsigned copy of a letter dated February 15, 1995, which purports to provide notice to one of the defendants — Trudy Coxe, Secretary of the Executive Office of Environmental Affairs — that Strahan intends to bring suit against all three defendants. (Complaint, Ex. 1.) At the June 15, 1995, hearing, Defendants represented that they had received such notice. Nevertheless, they contend, correctly, that the letter to Coxe does not indicate that the Secretary of Commerce was notified of the Defendants’ alleged ESA violations.
 

 Although one court has waived the sixty-day notice requirement,
 
 see Sierra Club v. Block,
 
 614 F.Supp. 488, 492 (D.D.C.1985), other courts, including one in this Circuit, that have addressed the issue have found the notice requirement to be jurisdictional.
 
 [22]
 

 See Maine Audubon Soc’y v. Purslow,
 
 672 F.Supp. 528 (D.Me.1987) (Cyr, D.J.)
 
 ajftd
 
 907 F.2d 265 (1st Cir.1990) (affirming imposition of monetary sanctions against counsel who filed suit one day after giving notice to defendants and secretary of the Interior);
 
 Marbled Murrelet v. Babbitt,
 
 83 F.3d 1068, 1072 (9th Cir.1996);
 
 Lone Rock Timber Co. v. United States Dep’t of Interior,
 
 842 F.Supp. 433, 440 (D.Or.1994);
 
 Building Indus. Ass’n of S. California, Inc. v. Lujan,
 
 785 F.Supp. 1020 (D.D.C.1992);
 
 cf. Hallstrom v. Tillamook County,
 
 493 U.S. 20, 31-33, 110 S.Ct. 304, 311-12, 107 L.Ed.2d 237 (1989) (holding failure to satisfy similar notice requirement under Resource Conservation and Recovery Act warranted dismissal). Thus, I informed Strahan, during the hearing on June 15, 1995, that he must prove that he provided notice to the Secretary of Commerce before filing his Complaint or his suit would be dismissed, without prejudice, for lack of jurisdiction.
 

 In his Affidavit of June 22, 1995, Strahan states: “Over two years ago, in the fall of 1992, I sent a notice of intent to bring suit under the Endangered Species Act to the Defendants____ At the same time, I sent a copy of this notice to the National Marine Fisheries Service’s national office in Silver Spring, MD.” (Second Strahan Aff. at 1.) Strahan did not provide any documentation to support his claim at that time. On August 24, 1995, however, Strahan provided an affidavit, attaching a copy of the notice of intent dated August 30,1992.
 

 Defendants move to strike Strahan’s Affidavits, on three grounds. They argue that the best evidence rule, Fed.R.Evid. 1002, requires that the original letter to NMFS, or a certified copy,
 
 [23]
 
 be produced to prove its contents. (Def.Strike Mem. at 4 n. 5.) Rule 1002 provides: “To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.” Under Rule 1004, however, the original is not required if it has been lost or destroyed, or if it cannot be obtained “by any available judicial process or procedure.” Fed.R.Evid. 1004. As the Advisory Committee explained, “basically the rule requiring the production of the original as proof of contents has developed as a rule of preference: if failure to produce the original is satisfactorily explained, secondary evidence is admissible.” Fed.R.Evid. 1004 advisory committee’s note.
 
 *977
 
 Here, Strahan states that he mailed the original to NMFS. Thus, it is not readily available to him, and NMFS in Silver Spring, Maryland, is not within the jurisdiction of this Court. In addition, the precise contents of the letter need not be established. All that is required is competent evidence that Strahan notified the Secretary of Commerce of his intent to bring suit against the Defendants. As the First Circuit has explained, “[n]o evidentiary rule ... prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation.”
 
 R & R Associates, Inc. v. Visual Scene, Inc.,
 
 726 F.2d 36, 38 (1st Cir.1984).
 
 Cf. Flick v. Borg-Warner Corp.,
 
 892 F.2d 285, 288 (3d Cir.1989) (“It is elementary that the loss of a copy of a document does not foreclose establishing its contents through the testimony of the draftsman----”); Fed. R.Evid. 1002 advisory committee’s note (“an event may be proved by nondocumentary evidence, even though a written record of it was made.”). Thus, the best evidence rule does not require that Strahan’s affidavit be stricken.
 

 Defendants do not raise the more fundamental objection that notice to NMFS in Silver Spring may not qualify as notice to the Secretary of Commerce under 16 U.S.C. § 1540(g)(2)(i). For example, in
 
 Save the Yaak Committee v. Block,
 
 840 F.2d 714, 721 (9th Cir.1988), the court held that a letter sent to the FWS regional director, but not to the Secretary of the Interior, did not satisfy the ESA notice requirement. Here, however, the Secretary of Commerce apparently has delegated all of his duties under the ESA to NOAA/NMFS.
 
 See
 
 Department of Commerce, Organization Order 10-15, § 3.01(x) (delegating ESA authority), § 3.05 (authorizing redelegation) (effective Jan. 11, 1988); Delegations of Authority to the Assistant Administrator for Fisheries, NOAA Organizational Handbook, pt. II.C.25 (redelegating ESA authority) (signed Apr. 30, 1993). Absent a defense challenge on this issue, I assume that Strahan sent notice to the appropriate office. I conclude that the ESA 60-day notice requirement has been satisfied by Strahan. I therefore turn to the question whether Strahan has standing under Article III of the Constitution.
 

 C.
 
 Standing
 

 There are three constitutional requirements for standing:
 

 First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) “actual or imminent, not ‘conjectural’ or ‘hypothetieal[.]’ ” Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be “fairly ... traee[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.”
 

 Lujan v. Defenders of Wildlife,
 
 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted) (alterations in original);
 
 see also Libertad v. Welch,
 
 53 F.3d 428, 436 (1st Cir.1995) (RICO).
 

 In a prior case brought by Strahan against the United States Coast Guard, I considered the requirements for standing in some detail.
 
 See
 
 Memorandum and Order,
 
 Strahan v. Linnon,
 
 slip op. at 18-21, No. 94-11128-DPW (as corrected May 19, 1995). I concluded that Strahan had standing to bring suit under the ESA for harm to Right whales in Massachusetts waters. Defendants - contend that
 
 Strahan v. Linnon
 
 is distinguishable, and that Strahan lacks standing in this case. I therefore review each of the standing requirements in turn.
 

 1.
 
 Injury in Fact
 

 The first requirement for standing is that the actions of the Defendants invade an actual and legally-cognizable interest of Strahan’s. Strahan’s deposition testimony in
 
 Strahan v. Linnon
 
 is useful on this question. Strahan testified that he engages in personal observation of whales, from the coast and, “as many as four to five times” per year, from whale watch boats.
 
 (Strahan v. Linnon,
 
 Strahan Depos. at 39-40.)
 

 The Defendants object to my taking judicial notice of this testimony. (Def.Reply
 
 *978
 
 Mem. at 11.) Under Fed.R.Evid. 201(b), judicial notice is appropriate only for a fact that is “not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.” Here, I take judicial notice of the fact that Strahan
 
 has testified, under oath,
 
 that he regularly observes whales in Massachusetts waters.
 
 See E.I. du Pont de Nemours & Co., Inc. v. Cullen,
 
 791 F.2d 5, 7 (1st Cir.1986) (taking judicial notice of related complaint filed by plaintiff in state court);
 
 St. Louis Baptist Temple, Inc. ¶. FDIC,
 
 605 F.2d 1169, 1172 (10th Cir.1979) (“Judicial notice is particularly applicable to the court’s own records of prior litigation closely related to the case before it.”) (citations omitted);
 
 Cagan v. Intervest Midwest Real Estate Corp.,
 
 774 F.Supp. 1089, 1091 n. 1 (N.D.Ill.1991) (taking judicial notice of court file in related case). I therefore do not require that Strahan submit an affidavit to the same effect. I do not take judicial notice of the fact that Strahan
 
 regularly observes whales in Massachusetts waters,
 
 as this fact is subject to reasonable dispute.
 
 See F.D.I.C. v. OFlahaven,
 
 857 F.Supp. 154, 157 (D.N.H.1994) (holding court “could not judicially notice the veracity of the allegations in the affidavits; it could only take- notice that the affidavits were in fact filed and that the factual averments were in fact made”). Strahan’s reported observations have not, however, been disputed by the Defendants. Regular observation of endangered whales in Massachusetts waters is a cognizable interest for standing purposes.
 
 See Defenders of Wildlife,
 
 504 U.S. at 562-63, 112 S.Ct. at 2137-38 (“[o]f course, the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for the purpose of standing”).
 

 Even if I rely solely on the evidence submitted in this case, however, I find that Strahan has a cognizable interest in protecting endangered whales from death and injury in Massachusetts waters. Strahan affirms that he “routinely go[es] “whale watching’ in New England....” (PI. Second Aff. at 2.) Strahan also states he is a “conservation biologist specializing in the conservation and recovery of endangered species,” (PI. First Aff. at l),
 
 [24]
 
 and is engaged in scientific research on the Northern Right whale,
 
 id.
 
 at 2. This provides sufficient evidence to show that Strahan has suffered, and will continue to suffer, an “injury in fact” from harm to endangered whales in Massachusetts waters. A plaintiff does not have to qualify as an expert witness in order to have a cognizable interest under Article III.
 
 [25]
 

 2.
 
 Causal Connection
 

 The second requirement for standing is that Strahan’s injury be “ ‘fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court.’ ”
 
 Defenders of Wildlife,
 
 504 U.S. at 560-61, 112 S.Ct. at 2136-37 (citations omitted) (alterations in original).
 

 Indisputably, the actions of third parties not before the court — commercial fishing and whale watch operations — are the immediate cause of the harm to endangered whales alleged here. Defendants do not place gill-nets and lobster gear in coastal waters, nor do they operate whale watch vessels. Nevertheless, the actions of these third parties are dependent on the actions of the Defendants. Fishing vessels
 
 cannot,
 
 legally, place gillnets and lobster gear in Massachusetts waters without permission from the Defendants. And whale watch vessels
 
 cannot,
 
 legally, approach within 500 yards of Right whales in Massachusetts waters without permission from the Defendants. Thus, to the extent that he challenges the operations of licensed
 
 *979
 
 commercial fishing and whale watch vessels, Strahan has shown a causal connection between the injury he has suffered (and will continue to suffer) and the actions of the Defendants in issuing such licenses.
 

 3.
 
 Redressability
 

 The third requirement for standing is that “it must be ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ”
 
 Defenders of Wildlife,
 
 504 U.S. at 561, 112 S.Ct. at 2136 (citations omitted).
 

 If the Defendants were to limit further, or ban (as Strahan requests), the use of gillnets and lobster gear in Massachusetts waters, it is likely that fewer endangered whales would be harmed through entanglements. Similarly, a prohibition on approaches to within 500 yards of Right whales, with no exception for whale watch vessels, would reduce the likelihood of injury to such whales through collisions with the vessels. Thus, a favorable decision would redress Strahan’s injury. Strahan therefore has standing under Article III.
 

 D.
 
 Tenth Amendment
 

 In their Reply Memorandum, Defendants argue that the Tenth Amendment bars issuance of injunctive relief. Defendants explain:
 

 It is undisputed that Strahan’s ultimate goal as an alleged whale preservationist is to obtain a total ban on gill net and lobster pot fishing in Massachusetts coastal waters on the grounds that such fishing is hazardous to whales____ Since federal law does not ban such fishing outright and since neither the Executive nor Legislative Branches of the federal government appear inclined to enact such a ban in the near future, Strahan in reality is requesting that the third branch of the federal government utilize the Commonwealth’s commercial fishing licensing process, to enact and enforce a federal ban on gill net and lobster pot fishing in Massachusetts coastal waters. For instance, if the Court grants the injunctive relief requested by Strahan, no gill net or lobster pot fishing can take place in Massachusetts coastal waters unless the Commonwealth obtains an incidental take permit from the United States Secretary of Commerce----
 

 In short, the Court will have “commandeered” the Commonwealth’s commercial licensing processes to enact and enforce a federal ban on gill net and lobster pot fishing in Massachusetts Coastal waters in violation of the Tenth Amendment to the United States Constitution.
 

 (Def.Reply at 2-4 (footnotes and citations omitted).)'
 

 Defendants rely on
 
 New York v. United States, 505
 
 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992),
 
 [26]
 
 in which the Court struck down a provision of the Low-Level Radioactive Waste Policy Act that required states to either accept ownership of hazardous waste or regulate pursuant to Congressional directions. The Court held: “[t]he Federal Government may not compel the States to enact or administer a federal regulatory program.”
 
 New York,
 
 505 U.S. at 188, 112 S.Ct. at 2435.
 

 The Defendants’ Tenth Amendment claim is misplaced. Put simply, the ESA does not require the Commonwealth to regulate commercial fishing at all.
 
 [27]
 

 Cf. FERC v. Mississippi,
 
 456 U.S. 742, 764, 102 S.Ct. 2126, 2140,
 
 *980
 
 72 L.Ed.2d 532 (1982) (upholding Public Utility Regulatory Policies Act) (“if a State has no utilities commission, or simply stops regulating in the field, it need not even entertain the federal proposals”). Nor is the Commonwealth required to modify its legislative process. Thus, the ESA gives the Commonwealth the “critical alternative” of declining to “administer” the federal program.
 
 Cf. New York,
 
 505 U.S. at 176-77, 112 S.Ct. at 2428-29. If Defendants cease exercising control over the use of gillnets and lobster gear in Massachusetts waters, then they will not be held liable, under Section 9, for any subsequent harm caused by such nets.
 

 Defendants do not contend that enforcement of Section 9 of the ESA against state agencies or officials,
 
 per se,
 
 violates the Tenth Amendment. As the Supreme Court noted in
 
 New York v. United, States,
 
 “federal courts may in proper circumstances order state officials to comply with federal law.”
 
 New York,
 
 505 U.S. at 179, 112 S.Ct. at 2430. The Court explained:
 

 [T]he text of the Constitution plainly confers this authority on the federal courts, the ‘judicial Power’ of which ‘shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States ...; [and] to Controversies between two or more States; [and] between a State and Citizens of another State.’ U.S. Const., Art. Ill, § 2.
 

 Id,
 

 Similarly, Article VI, Clause 2 of the Constitution provides that: “[tjhis Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land.... ” As the Supreme Court explained in
 
 Hodel v. Virginia Surface Mining and Reclamation Ass’n,
 
 “[a] wealth of precedent attests to congressional authority to displace or preempt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law.” 452 U.S. 264, 290, 101 S.Ct. 2352, 2367, 69 L.Ed.2d 1 (1981) (citations omitted). “Although such congressional enactments obviously curtail or prohibit the States’ prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result.”
 
 Id.
 
 (citations omitted).
 
 Cf. New York,
 
 505 U.S. at 160, 112 S.Ct. at 2420 (“Petitioners likewise do not dispute that under the Supremacy Clause Congress could, if it wished, pre-empt state radioactive waste regulation.”).
 

 Unlike the “take title” provision struck down in
 
 New York v. United States,
 
 the ESA exercises the federal pre-emption option without seeking to control the state legislative or regulatory process. The ESA simply directs that “[a]ny State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter____” 16 U.S.C. § 1535(f). As was true of the Surface Mining Control and Reclamation Act in
 
 Hodel,
 
 “there can be no suggestion that the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.”
 
 Hodel,
 
 452 U.S. at 288, 101 S.Ct. at 2366.
 

 For these reasons, I reject Defendants’ argument that the Tenth Amendment bars issuance of injunctive relief in this case.
 

 E.
 
 Eleventh Amendment
 

 Emboldened by the Supreme Court’s recent ruling in
 
 Seminole Tribe of Florida v. Florida,
 
 — U.S. -, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), Defendants have mounted a reinvigorated argument, only lightly developed in the initial briefing on these motions, that the Eleventh Amendment bars any and all of Strahan’s claims against the Commonwealth under the ESA
 
 [28]
 
 The Court in
 
 Seminole Tribe
 
 held that Congress did not have the power under the Indian Commerce Clause to abrogate state sovereign immunity from suit in federal court.
 
 Id.
 
 at-, 116
 
 *981
 
 S.Ct. at 1131-32. By expressly overruling
 
 Pennsylvania v. Union Gas Go.,
 
 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), the Court in
 
 Seminole Tribe
 
 also held that the Interstate Commerce Clause does not give Congress power to abrogate state sovereign immunity.
 
 See id.
 
 at-, 116 S.Ct. at 1128. That holding may arguably be extended to proscribe Congress from abrogating state sovereign immunity under the ESA, which is grounded on the Commerce Clause powers of the Congress. I do not, however, find it necessary to address this question, because it is not dispositive in the present ease. I find that the Plaintiff here may maintain the case pursuant to a well-established exception to the Eleventh Amendment when the relief sought is prospective.
 

 The exception is that created by
 
 Ex Parte Young,
 
 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which held that the Eleventh Amendment did not bar an action in the federal court to enjoin the Attorney General of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment.
 
 See Ex Parte Young,
 
 209 U.S. at 159— 60, 28 S.Ct. at 453-54 (“The state has no power to impart to [the state employee] immunity from responsibility to the supreme authority of the United States.”). The holding of
 
 Ex Parte Young
 
 has been limited to actions seeking only declaratory and/or injunctive relief against state officials to halt continuing violations of federal law.
 
 See Edelman v. Jordan,
 
 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974) (“a federal court’s remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief,, and may not include a retroactive award which requires the payment of funds from the state treasury.”) (citations omitted);
 
 Green v. Mansour,
 
 474 U.S. 64, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985) (holding declaratory judgment relief unavailable where “[t]here is no claimed continuing violation of federal law, and therefore no occasion to issue an injunction.”);
 
 Libby v. Marshall,
 
 833 F.2d 402, 406 (1st Cir.1987) (“because of Ex Parte Young, a state has to ‘stand trial’ whenever ... a suit against an official in his official capacity to remedy a violation of federal law — is brought against it.”);
 
 Ramirez,
 
 715 F.2d at 697 (“The distinction between permissible and impermissible relief in such cases turns on which way Lot’s wife is facing: prospective redress is allowable, retrospective redress is not.”). In the present action, Strahan seeks declaratory and injunctive relief rather than money damages payable from the public fisc. And even if the relief sought by Strahan would have an incidental effect on State revenues, “the fiscal consequences ... [will be] the necessary result of compliance with decrees which by their terms were prospective in nature.”
 
 Edelman,
 
 415 U.S. at 667-68, 94 S.Ct. at 1358. Thus, this action falls within the traditional scope of the exception to an Eleventh Amendment bar provided by
 
 Ex Parte Young.
 

 To be sure,
 
 Seminole Tribe
 
 further refined the application of
 
 Ex Parte Young
 
 in cases against state officials. In
 
 Seminole Tribe,
 
 the Court held that
 
 Ex Parte Young
 
 was inapplicable to a suit under § 2710(d)(3) of the Indian Gaming Regulatory Act (“IGRA”) against the Governor of Florida in his official capacity because the statute “prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right.”
 
 Seminole Tribe,
 
 — U.S. at-, 116 S.Ct. at 1132. The Court stated that the remedies provided for in the statute were meant not only to define but also “significantly to limit” the potential bases for relief under the statute.
 
 Id.
 
 at-, 116 S.Ct. at 1132-33.
 

 The Defendants contend that the holding in
 
 Seminole Tribe
 
 applies with the same force to the ESA and to the MMPA as it did to IGRA. Defendants argue that:
 

 [t]he statutory remedial scheme for enforcement of the ESA and MMPA directs that ... policy questions be resolved by NMFS in rulemaking, and not by the court through adjudication. Under the current scheme, Strahan may petition NMFS to issue regulations banning gillnet and lobster pot fishing in Massachusetts coastal waters or requiring the Commonwealth to apply for incidental and small take permits under the ESA and MMPA prior to licensing such fishing, (citation omitted).
 

 
 *982
 
 Defendants’ Memorandum in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction at 21.
 

 The Defendants overestimate the breadth of
 
 Seminole Tribe’s
 
 impact on
 
 Ex Parte Young.
 

 [29]
 

 The
 
 Seminole Tribe
 
 gloss on
 
 Ex Parte Young
 
 does not affect the statutes in the present action whose remedial schemes are not similar to the one provided for in IGRA. The Court said as much when it noted that the limited remedy created by IGRA “stands in contrast to” statutes such as those authorizing suits against
 
 any person
 
 who is alleged to be in violation of the relevant Act.
 
 See Seminole Tribe,
 
 — U.S. at -n. 17, 116 S.Ct. at 1133 n. 17. Unlike the IGRA, the ESA contains a citizen suit provision permitting any person to commence a civil suit “to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act....” 16 U.S.C. § 1540(g)(1)(A).
 
 Ex Parte Young,
 
 even as refined by
 
 Seminole Tribe,
 
 continues to provide an exception from the Eleventh Amendment for lawsuits such as Strahan’s under the ESA.
 
 [30]
 

 V.
 
 The Defendants’ Motion for Summary Judgment
 

 Having resolved the threshold issues, I turn to the merits of the Defendants’ motion for summary judgment on Counts I, II and IV.
 

 Under Fed.R.Civ.P. 56, summary judgment must be granted “where the record, including the pleadings, depositions, answers to interrogatories, admissions on. file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.”
 
 Goldman v. First Nat’l Bank of Boston,
 
 985 F.2d 1113, 1116 (1st Cir.1993) (citing Fed.R.Civ.P. 56(c)). In reviewing such materials, I view all the facts “in the light most favorable to the non-moving party and indulge all inferences advantageous to that party, provided they arise reasonably from the record.”
 
 Villanueva v. Wellesley College,
 
 930 F.2d 124, 127 (1st Cir.),
 
 cert. denied,
 
 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).
 

 In evaluating a summary judgment motion, “[i]nitially, the onus falls upon the moving party to aver ‘an absence of evidence to support the nonmoving party’s ease.’”
 
 LeBlanc v. Great Am. Ins. Co.,
 
 6 F.3d 836, 841 (1st Cir.1993) (citations omitted),
 
 cert. denied,
 
 - U.S. -, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Once this has been accomplished, it is then incumbent upon the nonmovant to show that there is in fact a “ ‘genuine issue for trial.’ ”
 
 Id.
 
 (citation omitted). In this effort, merely conjectural or problematic evidence will not suffice; nor will simple reference to the claims presented in the pleadings.
 
 Id,
 
 at 1119. Rather, an issue will be considered trialworthy only if “there is enough competent evidence to enable a finding favorable to the nonmoving party.”
 
 Goldman,
 
 985 F.2d at 1116. With these considerations in mind, I turn to the merits of Strahan’s claims. In Counts I, II and IV Strahan contends that three different types of takings, without a permit, have been caused by the Defendants: (1) entanglement in fishing gear; (2) habitat modification in the designated critical habitat of Cape Cod
 
 *983
 
 Bay; and (3) pursuit and harassment by whale-watch vessels.
 

 A.
 
 Entanglement in Fishing Gear
 

 In Count I of the Complaint, Strahan alleges that the entanglement of endangered species of whales in fishing gear is a taking of that species in violation of § 9 of the ESA because the entanglement results in the killing, injuring, and/or harassing of the whales.
 
 [31]
 
 (Complaint ¶ 76.) Thus, it is necessary for me to determine whether alleged entanglements constitute a “taking” cognizable by the ESA. I also note that because substantial civil and criminal penalties may be imposed for violations of § 9,
 
 [32]
 
 the term “take” must be construed with great care.
 
 [33]
 

 Section 9(a)(1)(B) of the ESA makes it unlawful for any “person” to “take” any endangered species of fish or wildlife within the United States or the territorial sea of the United States.
 
 [34]
 
 16 U.S.C. § 1538(a)(1)(B). The term “take” is defined by statute as “harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.” 16 U.S.C. § 1532(19). Furthermore, under Section 9(g), “[i]t is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section.” 16 U.S.C. § 1538(g).
 

 The term “take” is to be construed liberally.
 
 Forest Conservation Council v. Rosboro Lumber Co.,
 
 50 F.3d 781, 784 (9th Cir.1995). It should be “‘defined in the broadest possible manner to include every conceivable way in which a person can ‘take’ or attempt to ‘take’ any fish or wildlife.’ ”
 
 Id.
 
 (citing S.Rep. No. 307, 93d Cong., 1st Sess.,
 
 reprinted in,
 
 1973 U.S.C.C.A.N. 2989, 2995);
 
 see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
 
 — U.S. -, -, 115 S.Ct. 2407, 2416 132 L.Ed.2d 597 (1995). Indeed, courts have construed “takings” of endangered species to occur in a number of expansive ways.
 
 See Defenders of Wildlife v. E.P.A.,
 
 882 F.2d 1294, 1301 (8th Cir.1989) (EPA’s registration of pesticides containing strychnine constituted a taking of endangered species);
 
 Loggerhead Turtle v. County Council of Volusia County,
 
 896 F.Supp. 1170, 1180-81 (M.D.Fla. 1995) (artificial beach lighting and vehicular beach access found to be a taking of sea turtles);
 
 Sierra Club v. Yeutter,
 
 926 F.2d 429, 438-39 (5th Cir.1991) (Forest Service’s management of timber stands a taking of the red-cockaded woodpecker);
 
 Swan View Coalition, Inc. v. Turner,
 
 824 F.Supp. 923, 940 (D.Mont.1992) (sufficient evidence to withstand summary judgment for grizzly bear takings claim due to open road densities in forest land);
 
 Palila v. Hawaii Dep’t of Land
 
 
 *984
 

 and Natural Resources,
 
 639 F.2d 495, 497-98 (9th Cir.1981)
 
 (Palila I)
 
 (state department’s practice of maintaining feral goats and sheep in endangered bird’s critical habitat constituted unlawful taking);
 
 National Wildlife Federation v. Burlington Northern Railroad,
 
 23 F.3d 1508, 1509 (9th Cir.1994) (railroad’s killing of grizzly bears along railroad tracks is a taking).
 

 I find that there is sufficient evidence in the record before me that the entanglement of endangered whale species in fishing gear in Massachusetts waters causes injury or death to those species. Some of this evidence can be found in the Defendants’ own writings. The Defendants state that “[f]ive right whales have been found entangled in fixed fishing gear in Massachusetts waters; three in gill nets and two in lobster lines.” Right Whales in Massachusetts Waters, An Executive Summary at 2, TRO Ex. 6;
 
 cf
 
 Phillips Letter to NMFS dated February 24,1995, at 2 (stating one reason for ban on gillnets was to prevent Right whale entanglements), TRO Ex. 8.
 

 In addition, the affidavits of three scientists demonstrate that entanglement of endangered whales in fixed fishing gear have harmed, injured, or killed those whales.
 
 [35]
 
 On May 15, 1983, a Right whale was observed “thrashing around” a location three miles east of Manomet Point in Plymouth, MA because of its entanglement in ropes attached to lobster buoys. (Mayo Aff. ¶ 10.) The whale “appeared to be having difficulty breathing and appeared exhausted.”
 
 Id.
 
 A whale marked #2366 was found dead one year after being observed entangled with fishing lines near Provineetown.
 
 [36]
 

 Id.
 
 ¶ 11. A Humpback whale died on November 7, 1982 on Com Hill Beach in Truro because of a “gillnet wrapped around its tail stock” which prevented it from eating. (Mattila Aff. ¶ 5.) Right whales were also found entangled in lobster and other fishing gear in Massachusetts waters on June 16,1978, May 13, 1982, October 14, 1985, May 15, 1983, August 29, 1986, August 7, 1993, November 17, 1994 (Mayo Aff. ¶¶ 15-17; Dorsey Aff. ¶¶ 17-21), and on August 17, 1995. (Maher Aff. ¶¶3-7.) At least one of these whales was not expected to survive its injuries fi*om the gear. (Mayo Aff. ¶ 17.) Humpback whales have been found similarly entangled in fishing gear in Massachusetts waters. (Dorsey Aff. ¶¶ 27-35.)
 

 The available scientific data indicates that although the documentation of entanglement in fishing gear is relatively infrequent, 57% of all Right whales have “scars around the tail stock that are apparently due to fishing gear ... [which] suggests that entanglements are more common than reported.” (Dorsey Aff. ¶ 9 (citing S.D. Kraus,
 
 Rates and Potential Causes of Mortality in North Atlantic Right Whales (Eubalaena Glacial-is),
 
 6 Marine Mammal Science 278-91).) Five of 26 Right whale entanglements in the Western North Atlantic Ocean resulted in the direct or indirect death of the whale. (Dorsey Aff. ¶ 10.) Whales that survive the entanglement still receive wounds from the entanglement.
 
 Id.
 
 ¶ 17;
 
 see also
 
 Right Whale Recovery Plan at 11 (describing injuries from fishing gear); Humpback Whale Recovery Plan at 25 (stating that fishing gear entanglement and entrapment are “the most frequently identified souree[s] of human-caused injury or mortality to humpback whales”).
 

 The scientific evidence before me also indicates that “lobster pot and gillnet fishing gear in Cape Cod and Massachusetts Bays pose a threat of harm to individual right whales and a potential threat to the recovery of the species.” (Mayo Aff. ¶ 19;
 
 see also
 
 Mattila Aff. ¶ 13.) The Defendants contend that Strahan cannot show that the entanglements were from fishing gear permitted by the state. The scientific evidence, however, indicates otherwise. For example, at least three of the entanglements described
 
 supra
 
 “involved fishing gear that was deployed in
 
 *985
 
 Massachusetts waters.”
 

 [37]
 

 (Dorsey Aff. ¶ 36.) It' is also quite likely that this number is higher because of the infrequency of observations, because the whale is not anchored to one location by the fishing gear, and because identifying parts of the gear do not remain attached to the whale.
 
 Id.
 
 ¶¶23, 24, 36. The Defendants do not dispute any of this evidence. Based upon the scientific affidavits, therefore, there is sufficient evidence to support Strahan’s factual allegations that endangered whales have been taken through entanglement in fishing gear permitted by the Defendants in Massachusetts waters.
 

 Additionally, I find that it is irrelevant that Defendants’ permitting of commercial fishing gear is only an indirect cause of whale entanglement in those lines. The Defendants’ permitting activities are similar to the EPA’s registration of pesticides containing strychnine which the Eighth Circuit found to be a violation of § 9 of the ESA.
 
 Defenders of Wildlife,
 
 882 F.2d at 1300-01. The
 
 registration
 
 of pesticides containing strychnine, as opposed to their subsequent
 
 use,
 
 was not the immediate cause of the deaths of any endangered animals, but was an indirect cause.
 
 Cf. Sweet Home,
 
 — U.S. at-, 115 S.Ct. at 2413. The takings occurred because pesticides could not be sold or distributed without EPA permission:
 

 The EPA’s strychnine registrations had a prohibited impact on endangered species. First, the record shows éndangered species have eaten the strychnine bait, either directly or indirectly, and as a result, they have died. The district court noted that defendants did not seriously dispute these poisonings had occurred. Second, strychnine can be distributed only if it is registered. Consequently, the EPA’s decision to register pesticides containing strychnine or to continue these registrations was critical to the resulting poisonings of endangered species. The relationship between the registration decision and the deaths of endangered species is clear. We thus conclude the EPA’s registrations constituted takings of endangered species.
 

 882 F.2d at 1301 (citations omitted).
 
 See also National Wildlife Federation v. Hodel,
 
 15 Envtl.L.Rep. (Envtl.L.Inst.) 20891, 20893, 1985 WL 186671 (E.D.Cal.1985) (holding that the Fish and Wildlife Service’s decision to authorize the use of lead shot ammunition constituted a taking of bald eagles under the ESA) “It is irrelevant whether the taking is direct or indirect.”
 
 United States v. GlennColusa Irrigation District,
 
 788 F.Supp. 1126, 1133 n.13 (E.D.Cal.1992) (holding that pumping of water from river, which caused endangered Chinook salmon to be trapped on fish screens, constituted a taking);
 
 cf. Sweet Home,
 
 — U.S. at-, 115 S.Ct. at 2413.
 

 The permitting of fishing gear is analogous to the registration of strychnine. In the absence of permitting, no fish entanglement could occur.
 
 See
 
 Mass.Gen.L. ch. 130, § 17A (management of marine fisheries); Mass. Gen.L. ch. 130, § 80 (with exceptions for holders of other permits, “no person shall fish for or take fish for commercial purposes in the coastal waters ... unless he is the holder of a commercial fisherman permit”); Mass.Gen.L. eh. 130, § 38 (“A person shall not fish for or take lobsters or edible crabs in coastal waters ... without a permit issued by the director [Coates]”); 322 C.M.R. §§ 4.09, 4.11 (gillnets), §§ 6.13, 6.14 (lobster fishing), §§ 7.01-7.05 (permits); § 7.01(7) (“The Director [of DMF] may at any time, in his discretion, attach any written conditions or restrictions to the permit deemed necessary
 
 *986
 
 or appropriate for purposes of conservation and management or to protect the public health, welfare and safety.”); § 8.10 (“A regulated fishery permit shall be required to harvest, catch, or take any species of fish by means of a gillnet to be issued in accordance with 322 CMR 7.01(4)(a).”).
 

 Additionally, the scientific evidence in this case meets the First Circuit’s standard that a taking requires a showing “that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species.”
 
 American Bald Eagle v. Bhatti,
 
 9 F.3d 163, 166 (1st Cir.1993). In
 
 American Bald Eagle,
 
 the First Circuit considered an ESA challenge to the decision of the Massachusetts DFW to allow limited deer hunting on a state reservation that was inhabited by bald eagles.
 
 [38]
 
 The court affirmed the denial of injunctive relief, finding that
 
 no studies
 
 were presented that demonstrated that the use of lead slugs was scientifically proven to injure bald eagles.
 
 Id.
 
 at 165. In contrast here, Strahan has presented sufficient evidence that entanglements in fishing gear injures or kills endangered whales.
 
 See supra.
 

 I also find that Strahan has presented sufficient evidence that the Defendants know or should know that fishing gear injure or kill endangered whales.
 
 [39]
 

 See, e.g.,
 
 Executive Summary at 2, TRO Ex. 6; Charles Mayo, Philip Hamilton, & Marilyn K. Marx, Report to the Commonwealth of Massachusetts, Division of Marine Fisheries: Characteristics of the Population and Habitat Use Patterns of the Right Whale
 
 Eubalaena glacialis
 
 In the Waters of the Commonwealth, at 7 (1987) (“A variety of materials placed in the marine environment appear to impact right whales. Of those, fishing gear, particularly fixed nets, anchored lines and untended floating nets appear to have the greatest potential impact”) (prepared pursuant to a DMF contract with the Center for Coastal Studies and submitted by DMF to the General Court see TRO Ex. 6 at 5), TRO Ex. 3; Scott D. Kraus & Charles A. Mayo, Recommendations for Research and Management of Right Whales in Massachusetts Waters at 24 (1987) (“We recommend serious consideration of a
 
 seasonal
 
 ban on fixed fishing gear within the areas identified as high-use right whale habitat”) (funded by DMF
 
 see
 
 TRO Ex. 4 at 19), TRO Ex. 5. For all of these reasons, I will deny the Defendants’ motion for summary judgment on Count I.
 

 E.
 
 Habitat Modification by Gillnets and Lobster Gear
 

 In Count II of his Complaint, Strahan alleges:
 

 The Defendants by licensing and regulating the deployment of fixed-fishing gear (in the form of gill nets and lobster gear) in Massachusetts Bay in habitat that has been designated by NMFS as listed critical habitat of the Northern Right Whale is [sic] violating the take prohibitions of Section 9 of the ESA by taking the Northern Right Whales through “harm.” ... The Defendants’ deployment of gill nets, lobster gear, and other fishing gear in waters in an area (Cape Cod Bay) that is within boundaries of the listed critical habitat for these whales, has significantly degraded the critical habitat to the point where Northern Right Whales will become killed and injured, directly through the entanglements with the deployed fishing gear, as well as through the significant impairment of their feeding, swimming, and other essential.behaviours____
 

 Complaint ¶ 82;
 
 see also
 
 Amended Complaint ¶82. Strahan thus claims that the deployment of fishing gear in an area that is designated a critical habitat of endangered Northern Right whales is a harmful modification of that habitat and a taking in violation of the ESA.
 
 [40]
 

 
 *987
 
 The Supreme Court held last term in
 
 Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
 
 that takings under the ESA can include habitat modifications that actually kill or injure wildlife, — U.S. at -, 115 S.Ct. at 2416. Takings can also include a “harm” to a protected species.
 
 [41]
 

 See
 
 50 C.F.R. § 17.3(c) (West 1995). This harm can “encompassf ] indirect as well as direct injuries”.
 
 Sweet Home,
 
 — U.S. at -, 115 S.Ct. at 2413. Thus, even activities that are “not intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary permits them.”
 
 Id.
 
 at-, 115 S.Ct. at 2414. This is because the statutory language is clear that “actions or effects that do not require direct applications of force” may still be considered a “taking”.
 
 Id.
 
 at-, 115 S.Ct. at 2415.
 

 In
 
 Sweet Home,
 
 the Supreme Court also affirmed the Ninth Circuit’s interpretation of the word “harm” in
 
 Palila v. Hawaii Dep’t of Land and Natural Resources,
 
 852 F.2d 1106 (9th Cir.1988)
 
 (Palila II). Sweet Home,
 
 — U.S. at - 115 S.Ct. at 2412. In
 
 Palila II,
 
 the Ninth Circuit held that an impermissible habitat modification, and thus a taking, occurred where a state agency maintained feral sheep in an endangered bird’s critical habitat.
 
 Palila II,
 
 852 F.2d at 1110. The sheep destroyed the woodlands upon which the endangered bird was solely dependent.
 
 Id.
 
 at 1107 n. 2. In affirming the trial court’s order to remove the sheep, the Court of Appeals stated that this habitat degradation could result in extinction of the bird species and thus was a “harm” and a “taking” under the ESA.
 
 Id.
 
 at 1110.
 

 At least one court since
 
 Sweet Home
 
 has addressed the issuance of an injunction based upon a habitat modification claim. In
 
 Loggerhead Turtle v. County Council of Volusia County, Florida,
 
 896 F.Supp. 1170, 1172 (M.D.Fla.1995), the Florida District Court considered a claim that a county’s beach-related ordinances for artificial lighting and vehicular access posed an immediate danger to endangered and threatened sea turtles.
 
 Loggerhead Turtle,
 
 896 F.Supp. at 1172-73. Because artificial beach lighting had the ef-' feet of drawing turtle hatchlings toward the light, rather than the sea, and because driving vehicles on the beach destroyed turtle nests, the court found that the lighting and vehicular access constituted a taking of the turtles.
 
 Id.
 
 at 1181-82.
 
 See also Forest Conservation Council, 50 F.3d
 
 at 788 (summary judgment inappropriate where sufficient evidence that clear-cutting of 40 acres of timber was a habitat modification that would significantly impair endangered spotted owl).
 

 Based upon the
 
 Sweet Home
 
 analysis, I thus find that Strahan has sufficiently stated a claim that the permitting of fixed fishing gear by the Defendants results in a harmful taking of endangered whales through the modification of their habitat. Portions of Cape Cod Bay, Stellwagen Bank, and the Great South Channel have been designated as critical Right whale habitat.
 
 See
 
 59 Fed.Reg. 28,793 (June 3, 1994). In addition, the Commonwealth of Massachusetts has restricted the use of gillnets south and
 
 *988
 
 west of Cape Cod and within parts of Massachusetts Bay during certain times of the year because of the importance of this area to the whale.
 
 See
 
 322 C.M.R. §§ 4.09(2) & 4.11(2). These areas accordingly appear “essential to the conservation of the species.” 16 U.S.C. § 1532(5)(A). I will thus deny the Defendants’ motion for summary judgment on Count II.
 

 C.
 
 Pursuit and Harassment by Whale Watch Vessels
 

 In Count IV of his Complaint, Strahan claims that the Defendants allow whale watch ships to “take” Northern Right whales by pursuing and harassing the whales. (Complaint & Amended Complaint ¶ 93.) He asks this Court to “enjoin the Defendants from authorizing any person or issuing any license pursuant to the provisions of 322 C.M.R. 12.00
 
 et seq.,
 
 to allow the pursuit of any Northern Right Whale at any distance and to allow operation or presence of any person or vessel to a Northern Right Whale.” (Complaint & Amended Complaint, Prayer for Relief ¶ 7.)
 

 Because Defendants do not regulate the general activities of whale watch vessels, (Coates Aff. ¶ 10), I consider Strahan’s claim in Count IV only as it relates to DMF’s issuance of “a limited number of scientific research permits to some whale watch vessels exempting them from the 500 yard buffer zone[.]” (Coates Aff. ¶ 11). Strahan contends that the last such permit was issued in 1989, and resulted in the death of a baby Right whale. (Complaint & Amended Complaint ¶ 65.) He states: “After this tragedy, the Defendants has [sic] yet to issue any subsequent permits but a real possibility exists that they will. The Defendants have never claimed that they would not issue any more permits to pursue Northern Right Whales.” (Complaint & Amended Complaint ¶ 65.)
 

 Under these circumstances, there is no basis to issue injunctive relief to prevent Defendants from issuing such permits because Strahan has not shown a likelihood that the Defendants will repeat their actions of 1989. As the First Circuit recently noted, “[c]ourts should always be hesitant to answer hypothetical questions. That hesitancy does not evaporate merely because a suit is couched as a plea for declaratory relief.”
 
 Ernst & Young v. Depositors Economic Protection Corp.,
 
 45 F.3d 530, 538 (1st Cir.1995) (citations omitted). Here, even greater hesitancy is appropriate because Strahan seeks injunctive, rather than declaratory relief.
 
 Cf. Narragansett Indian Tribe v. Guilbert,
 
 934 F.2d 4, 5 (1st Cir.1991) (noting court must consider potential for irreparable injury before issuing injunction).
 

 I note further that Strahan has made no showing that whales are disturbed, injured, or otherwise “taken” by approaches at 500 yards.
 
 [42]
 
 Defendants are entitled to summary judgment on Count IV.
 

 D.
 
 Summary
 

 Strahan has sufficiently shown that the Commonwealth’s licensing of fixed fishing gear by commercial fishing operations had caused and is likely to continue to cause actual harm to endangered whales if such licensing continues. Furthermore, Strahan has stated a sufficient alternative claim that such licensing may result in impermissible habitat modification to the whale’s environment. Strahan has not, however, stated a sufficient claim on Count TV, and he does not have a cause of action on Count III. Once it is established that a given action is sufficiently likely to cause actual harm to an endangered species, the equitable powers of the court may be deployed. I address equitable remedies in the next section.
 

 VI.
 
 Strahan’s Motion for a Preliminary Injunction
 

 The test for the issuance of a preliminary injunction under the ESA differs from the traditional test.
 
 [43]
 
 For cases involving
 
 *989
 
 the ESA, “Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties’ competing interests.”
 
 National Wildlife Federation,
 
 23 F.3d at 1511 (citing
 
 Friends of the Earth v. United States Navy,
 
 841 F.2d 927, 933 (9th Cir.1988) (citation omitted)). The statutory language, history, and structure of the ESA “indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.”
 
 TVA v. Hill,
 
 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978). “In
 
 TV A v. Hill,
 
 [the Supreme Court] held that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity.”
 
 Weinberger v. Romero-Barcelo,
 
 456 U.S. 305, 313, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982) (distinguishing statutory language of the Federal Water Pollution Control Act from the ESA);
 
 accord Amoco Production Co. v. Village of Gambell, Alaska,
 
 480 U.S. 531, 543 n. 9, 107 S.Ct. 1396, 1403 n. 9, 94 L.Ed.2d 542 (1987). Under the ESA, “the balance of hardships and the public interest tips heavily in favor of protected species.”
 
 National Wildlife Federation,
 
 23 F.3d at 1511 (citations omitted).
 

 On the present record, it is clear that endangered whales use Massachusetts coastal waters where gillnets and lobster gear are placed, and that gillnets and lobster gear have harmed endangered whales and are likely to continue doing so. “[C]ourts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species.”
 
 American Bald Eagle,
 
 9 F.3d at 166. Defendants have been aware of the actual harm to endangered whales from fixed fishing gear since 1988, at the latest.
 
 See, e.g.,
 
 Executive Summary at 2, TRO Ex. 6; Mayo Report at 7, TRO Ex. 3; Kraus Report at 24, TRO Ex. 5; Phillips Aff. ¶¶ 3-5. If Defendants continue to authorize the use of gillnets and lobster gear in Massachusetts coastal waters while endangered whales are present, there is a strong likelihood that endangered whales will be “taken” in violation of the ESA.
 
 Cf. In re Pye,
 
 38 F.3d 58, 63 (1st Cir.1994) (holding that when the interim relief sought by the plaintiff “ @is essentially the final relief sought, the likelihood of success should be strong1 ”) (citation omitted);
 
 see also Gately v. Massachusetts, 2
 
 F.3d 1221, 1224 (1st Cir.),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).
 

 In light of these facts, I conclude that interlocutory relief, albeit not in the form sought by Plaintiff, is warranted at this time. The difficulty is in fashioning an injunction that respects the contours of both the powers and limitations of a federal court and the protection afforded to an endangered species.
 

 CLF has urged that injunctive relief be granted in the following way:
 

 1. preparation of a mailing to all existing holders of Massachusetts fisheries permits and to all applicants for such permits containing the following information:
 

 a. a description of endangered species of whales,
 

 b. an explanation of why entanglements of such whales should be promptly reported, and
 

 e. methods of reporting such entanglements by telephone and marine radio;
 

 2. preparation of weekly surveillance flights over right whale critical habitat to occur from January through April 1996 with the purpose of detecting entangled whales; and
 

 3. consultation with the National Marine Fisheries Service and the Center for Coastal Studies, to ensure that the two tasks listed above are accomplished in the most effective manner.
 

 (CLF Brief at 26 (citations omitted).) At the status hearing on March 13, 1996, I asked the Defendants to address, by way of affidavit, whether the Commonwealth had undertaken any of these measures. Commissioner of DFW John Phillips submitted an affidavit stating that weekly surveillance flights over
 
 *990
 
 critical habitat areas began this year during the months of January through April. (Phillips Aff. ¶ 5.) The purpose of these flights were to spot any entanglements of whales in fishing gear and to report the same to the Center for Coastal Studies.
 
 Id.
 
 ¶ 5(a). DFW has also scheduled meetings with NMFS and the U.S. Coast Guard to increase surveillance flights for the purpose of broadcasting warnings of whale sightings over marine frequencies of ship traffic and fixed gear fishermen.
 
 [44]
 
 The affidavit also indicated that DFW is:
 

 (1) promulgating regulations that prohibit the use of more than 800 pots by coastal lobster fishermen; (2) issuing a moratorium on the issuance of new sink gill net regulated fishery permits; (3) banning the use of sink gill nets in all Massachusetts coastal waters (a) south of Boston during the month of March, (b) north of Cape Ann during the month of November, and (c) south of Cape Cod from April to November 15; (4) administering a statutory moratorium on the issuance of any new coastal lobster fishing permits; and (5) making plans to circulate information on Right Whale sightings ... [in order] to notify commercial fixed gear fishermen.
 

 Id.
 
 ¶ 5(d).
 

 In order to encourage further formal consultations by the Defendants with a view toward developing additional protective measures, I will order the following:
 

 First, that the Defendants apply for an incidental take permit from NMFS on or before October 18, 1996,
 
 see
 
 16 U.S.C. § 1539(a), for Northern Right whales;
 

 Second, that the Defendants apply for a permit under the Marine Mammal Protection Act on or before October 18, 1996,
 
 see
 
 16 U.S.C. § 1387, for Northern Right whales
 
 [45]
 
 ;
 

 Third, that the Defendants develop and prepare a proposal, to be submitted to the court on or before December 16, 1996, to restrict, modify or eliminate the use of fixed-fishing gear in coastal waters of Massachusetts listed as critical habitat for Northern Right whales in order to minimize the likelihood additional whales will actually be harmed by such gear’
 
 [46]
 

 
 *991
 
 Fourth, the Defendants will be ordered to convene an Endangered Whale Working Group and to engage in substantive discussions with the Plaintiff, or his representative, as well as with other interested parties, regarding modifications of fixed-fishing gear and other measures to minimize harm to the Northern Right whales.
 
 [47]
 

 The Endangered Whale Working Group should loosely be modeled after the Take Reduction Teams
 
 [48]
 
 and the Regional Scientific Review Groups
 
 [49]
 
 required by the MMPA. Membership must be approved by the Court. The Plaintiff shall nominate one member, amicus curiae shall nominate one member, Defendants will nominate three members, and two members shall be nominated jointly by Defendants and Plaintiff after consultation with and reflecting the interests of local marine biologists,
 
 e.g.,
 
 the Center For Coastal Studies, and commercial fishing representatives.
 

 In fashioning this remedy, I note that it is appropriate to afford the Defendants the opportunity to complete the administrative process that Congress envisioned in allowing incidental takes of endangered species, without influencing that process by issuing a ban on gillnets or lobster gear at this time. On the other hand, because sufficient evidence has been provided to demonstrate that endangered whales have been and will continue to be at great risk of becoming entangled in 1996,1 can no longer wait until the appropriate federal agencies decide whether to grant the Defendants any take permit before initiating a process needed to resolve the complicated factual questions surrounding the pro
 
 *992
 
 tection of endangered whales. Because I “have no expert knowledge on the subject of endangered species”,
 
 see TVA v. Hill,
 
 437 U.S. at 194, 98 S.Ct. at 2301-02, it is appropriate to allow those interested parties with such expertise to develop the measures designed to protect endangered whales in the first instance.
 

 I therefore order that the Working Group here ordered be organized on an expedited schedule. Nominations for the Working Group’s composition shall be submitted to the Court for approval no later than October 18, 1996. At that time, a tentative schedule of and agenda for meetings will also be submitted to the court by Defendants. Meetings should start forthwith upon approval of membership by the Court. The Defendants will be responsible for keeping detailed minutes of the Working Group’s meetings and will submit them, together with a summary status report, to the Court at regular intervals to be determined at a later date.
 

 VII.
 
 Conclusion
 

 For the reasons set forth more fully above, the Defendants’ motions for summary judgment have been DENIED as to Counts I and II and ALLOWED as to Count IV; the Motion to Dismiss has been ALLOWED as to Count III; and interlocutory relief is GRANTED to the extent reflected in the ORDER issued this day.
 

 ORDER
 

 In accordance with the Memorandum issued this day, it is hereby ORDERED
 

 (1) That the Defendants shall apply for an incidental take permit from NMFS on or before October 18, 1996,
 
 see
 
 16 U.S.C. § 1539(a), for Northern Right whales;
 

 (2) That the Defendants shall apply for a permit under the Marine Mammal Protection Act on or before October 18, 1996,
 
 see
 
 16 U.S.C. § 1387, for Northern Right whales;
 

 (3) That the Defendants shall develop and prepare a proposal, to be submitted to the Court on or before December 16, 1996, to restrict, modify or eliminate the use of fixed-fishing gear in coastal waters of Massachusetts listed as critical habitat for Northern Right whales;
 

 (4) That the Defendants shall convene an Endangered Whale Working Group to engage into substantive discussions with the Plaintiff, or his representative, as well as with other interested parties, regarding modifications of fixed-fishing gear and other measures to minimize actual harm to Northern Right whales; and it is further ORDERED:
 

 (a) That the membership shall be subject to approval by the Court;
 

 (b) That Plaintiff shall nominate one member, amicus curiae shall nominate one member, Defendants shall nominate three members, and two or more members shall be nominated jointly by Defendants and Plaintiff after consultation with and reflecting the interests of local marine biologists and commercial fishing representatives; and
 

 (c) The parties shall submit their nominations to the Court on or before October 18, 1996.
 

 [1]
 

 . The Massachusetts Division of Marine Fisheries ("DMF”) defines a “bottom gillnet” as "vertical walls of webbing, whether anchored or drifting, which is buoyed on the top and weighted on the bottom to remain in an upright position, designed to capture fish on or near the seabed by entanglement, gilling or wedging.” 322 C.M.R. § 4.11(1). Massachusetts prohibits the use of gillnets between May 15 and November 1 within a defined management area in Massachusetts Bay. 322 C.M.R. § 4.11(2);
 
 see also
 
 322 C.M.R. § 4.09(2) (restricting use of gillnets south and west of Cape Cod between April 1 and November 15).
 

 [2]
 

 . The phrase "lobster gear” apparently refers to lobster "buoy, pot, trap and car,” as those terms are used in Mass.Gen.L. ch. 130, § 38, which requires a DMF permit for lobster fishing.
 
 See also
 
 322 C.M.R. § 4.13(2) (defining "pot trawls” as "single pots tied together in a series and buoyed at both ends”).
 

 [3]
 

 . Section 10 of the ESA and Section 17 of the MMPA permit certain
 
 de minimus
 
 takings if specific criteria are met and proper procedures have been followed to obtain incidental take permits.
 
 See
 
 16 U.S.C. §§ 1387, 1539(a).
 

 [4]
 

 . I treat each "Claim for Relief” as a separate Count.
 

 [5]
 

 . I note that the federal National Marine Fisheries Service has recently proposed a rule that would prohibit any vessel maneuver that would intercept a Northern Right whale within 500 yards.
 
 See
 
 61 Fed.Reg. 41116 (Aug. 7, 1996).
 

 [6]
 

 . GreenWorld is an organization dedicated to the preservation and recovery of endangered species.
 
 (See
 
 Complaint ¶ 15.) Strahan also states that he is a conservation biologist. Strahan Second Aff. at 1.)
 

 [7]
 

 . Count I claims that defendants violate § 9 of the ESA because their licensing and regulation of fishing gear in Massachusetts coastal waters allegedly results in incidental takings of Northern Right whales without a permit. (Complaint ¶ 76.) Count II alleges that the licensing of gill- • nets and lobster gear in the NMFS-designated critical habitat of Massachusetts Bay is an impermissible modification of that habitat.
 
 Id.
 
 ¶ 82. Count III alleges .that § 103 of the Marine Mammal Protection Act (MMPA), which prohibits the taking of a marine mammal in United States coastal waters without a permit, is violated through the defendants' licensing and regulation of fishing gear in Massachusetts coastal waters because such licensing and regulation allegedly results in the entanglement of Northern Right whales in fishing gear.
 
 Id.
 
 ¶¶ 88-90. Count IV claims that the defendants' authorization and regulation of whale-watching activities results in the intentional pursuit and harassment of Northern Right whales in violation of § 9 of the ESA.
 
 Id.
 
 ¶93.
 

 Strahan seeks a declaratory judgment that the authorization and regulation of gill nets and lobster gear in the Massachusetts Bay critical habitat for Northern Right whales is a violation of § 9. (Prayer for Relief ¶¶ 1-2) Strahan also seeks declaratory and injunctive relief regarding fishing gear in all Massachusetts coastal waters without an incidental take permit under § 10 of the ESA and a small take permit under § 101(a)(5) of the MMPA. ¶¶3-6.
 

 [8]
 

 . Strahan initially requested a one-day extension to file evidence of the notice he had allegedly provided to the Secretary of Commerce, because a "computer error destroyed the file and it cannot be replaced till [sic] June 22." (Pl.Mot. Leave to file Affidavit Late.) Strahan certified that "a copy of this motion will be mailed or hand delivered to Defendants as soon as possible.”
 
 Id.
 
 On June 22, 1995, Strahan filed a Second Affidavit, in which he stated: "Over two years ago, in the fall of 1992, I sent a notice of intent to bring suit under the Endangered Species Act to the Defendants.... At the same time, I sent a copy of this notice to the National Marine Fisheries Service' national office in Silver Spring, MD.” (Second Strahan Aff. at 1.) Strahan did not attach a copy of the notice, nor did he provide any other documentation to support his claim. Finally, on August 24, 1995, Strahan submitted an affidavit, attaching a copy of the notice of intent dated August 30, 1992.
 

 [9]
 

 . Defendants did, in fact, object to my "taking judicial notice of its ruling in
 
 Linnon
 
 to hold that Strahan has standing in this action.” (Def.Reply at 11.)
 

 [10]
 

 . On June 21, 1995, Strahan filed his Affidavit alleging the entanglement of whales in fishing gear. He also filed a copy of the Humpback Whale Recovery Plan. The Defendants have moved to strike Strahan’s Affidavits, contending that the affidavits contain inadmissible evidence and were filed in bad faith or solely for the purpose of delay.
 

 [11]
 

 . Mayo is a senior scientist at the Center for Coastal Studies (CCS), a private, non-profit organization in Provincetown, Massachusetts for research, education, and conservation in coastal and marine environments. (Mayo Aff. HI.)
 

 [12]
 

 .
 
 Mattila is also a senior scientist at CCS. (Mattila Aff. ¶ 1.)
 

 [13]
 

 . Dorsey is a staff scientist at CLF.
 

 [14]
 

 . The Defendants moved to strike these affidavits.
 

 [15]
 

 . Defendant John Phillips submitted an affidavit detailing the extent to which DFW has undertaken many of the measures suggested by the CLF in its amicus curiae brief to protect the Northern Right whale.
 
 (See
 
 Phillips Aff. ¶¶ 3-5.) Defendants also submitted the affidavit of Thomas W. French, Assistant Director of the Massachusetts Division of Fisheries and Wildlife with responsibility for the Endangered Species Programs, which further catalogued the protective measure taken by DFW with respect to Right whales.
 
 (See
 
 French Aff. ¶¶ 8-10.)
 

 [16]
 

 . I have discussed the status of the Northern Right whale, and many other issues raised in this case, in the context of a related suit by Strahan against the Coast Guard.
 
 See
 
 Memorandum and Order,
 
 Strahan v.
 
 Linnon, slip op., No. 94-11128-DPW (as corrected May 19, 1995).
 

 [17]
 

 . At the June 15, 1995, hearing, Defendants indicated that they do not object to my taking judicial notice of facts reported by NMFS concerning endangered whales, so long as I also recognize any positive statements NMFS has made about the Commonwealth’s efforts to protect the Right whale.
 

 [18]
 

 . This document purports to have been submitted to the General Court “as required by Chapter 12 of the Resolves of 1985,” which states:
 

 RESOLVED: That the Department of Fisheries, Wildlife and Environmental Law enforcement is hereby authorized and directed, subject to appropriation, to make an investigation and study of the North Atlantic Right Whale, including an assessment of the population of
 
 *969
 
 said whale, and the need for and the implications of establishing measures designed to protect such population. Said department shall report to the General Court the results of such investigation and study and its recommendations, if any, together with drafts of legislation necessary to carry its recommendations into effect by filing the same with the Clerk of the House of Representatives on or before the last Wednesday in June, nineteen hundred and eighty-eight.
 

 (approved Jan. 8, 1986). Thus, I treat it as an admission of a party-opponent,
 
 see
 
 Fed.R.Evid. 801(d)(2)(C) & (D), which is contained in a self-authenticating publication purporting to be issued by public authority,
 
 see
 
 Fed.R.Evid. 902(5).
 

 [19]
 

 . Section 4(d) provides:
 

 Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife ... with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.
 

 16 U.S.C. § 1533(d).
 

 [20]
 

 . This regulation was upheld in
 
 Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,
 
 1 F.3d 1, 5-8 (D.C.Cir.1993),
 
 modified on other grounds on reh’g,
 
 17 F.3d 1463 (D.C.Cir. 1994),
 
 rev’d,
 
 -U.S.-, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).
 

 [21]
 

 . Section 1533(a)(2) provides, in relevant part:
 

 With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—
 

 (A) in any case in which the Secretary of Commerce determines that such species should — (i) be listed as an endangered species or a threatened species, or (ii) be changed in status from a threatened species to an endangered species,
 

 he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;____
 

 [22]
 

 .
 
 But see Sierra Club v. Yeutter,
 
 926 F.2d 429, 434-37 (5th Cir.1991) (holding § 1540(g)(2)(A), "though clearly mandatory, is not jurisdictional 'in the strict sense of the term,’ and hence may not be availed of for the first time on appeal by an appellant seeking reversal ...”).
 

 [23]
 

 . Defendants are in error. A "certified copy” is not deemed equivalent to the original under the best evidence rule.
 
 See
 
 Fed.R.Evid. 1004 advisory committee's note ("The rule recognizes no 'degrees' of secondary evidence.”).
 

 [24]
 

 . Defendants argue that Strahan's claim to be a "conservation biologist" is inadmissible because Strahan has not proven he has personal knowledge of his own training and is expressing an opinion. (Def.Mem.Strike at 8.) I find these contentions to be without merit. Defendants’ motion to strike Strahan's affidavits will be denied. I have not considered any inadmissible statements in the affidavits.
 

 [25]
 

 . Accordingly, it is of little significance whether Strahan’s view of "scientific research” is more expansive than that of the established community of whale researchers.
 

 [26]
 

 . Defendants also cite
 
 Davids v. Akers,
 
 549 F.2d 120, 127 (9th Cir.1977), in which the court held that committee appointments in state legislatures need not be made in proportion to the strength of the major parties in the legislature, and
 
 United States
 
 v.
 
 Best,
 
 573 F.2d 1095, 1102-03 (9th Cir. 1978), in which the court held that suspension of a motorist's California driver's license for drunk driving on a federal enclave exceeded the scope of the federal interest and was unduly intrusive on the state's regulation of its highways. In addition to being factually distinguishable, both decisions relied on
 
 National League of Cities v. Usery,
 
 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (holding state employers not subject to Fair Labor Standards Act), which was later overruled by
 
 Garcia v. San Antonio Metropolitan Transit Authority,
 
 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985),
 
 modified by,
 
 42 U.S.C. § 2000d-7. Thus, I do not find them useful here.
 

 [27]
 

 . Defendants do not challenge the ESA provisions concerning cooperation with the states, 16 U.S.C. § 1535, or the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 ei
 
 seq.
 
 Thus, I consider only whether application of Section 9 of the ESA against the Defendants would violate the Tenth Amendment.
 

 [28]
 

 . Defendants apply the same analysis to any claims arising under the MMPA ”[t]o the extent that a citizen suit against the States can be read into [that] statute.”
 
 Id.
 
 at n. 14. I have determined in Part IV.A.,
 
 supra,
 
 that there is no private right of action under the MMPA. Consequently, I focus in this section on the ESA.
 

 [29]
 

 . The Supreme Court itself emphasized the limited nature of its holding when it stated that "we do not hold that Congress cannot authorize federal jurisdiction under Ex Parte Young over a cause of action with a limited remedial scheme. We find only that Congress did not intend that result in the Indian Gaming Regulatory Act.”
 
 Seminole
 
 Tribe, - U.S. at - n. 17, 116 S.Ct. at 1133 n. 17.
 

 [30]
 

 . I note that this conclusion was recently reached by the Ninth Circuit with respect to the Clean Water Act, which contains a citizen suit provision similar to that in the ESA.
 
 Natural Resources Defense Council v. California Dep't Trans.,
 
 96 F.3d 420 (9th Cir. 1996). In finding that
 
 Seminole Tribe
 
 had no impact on the application of
 
 Ex Parte Young
 
 to suits under the Clean Water Act, the Ninth Circuit observed that the citizen suit provision in the Clean Water Act specifies that it applies “to the extent permitted by the Eleventh Amendment” and that, therefore, “[fit would seem reasonable ... that Congress implicitly intended to authorize citizens to bring
 
 Ex Parte Young
 
 suits____”
 
 Id. at
 
 424. The parallel provision in the ESA also extends jurisdiction to the extent permitted by the Eleventh Amendment.
 
 See
 
 16 U.S.C. § 1540(g)(1)(A).
 

 [31]
 

 . The Complaint describes the following incidents of entanglement: (1) Blue whale entangled in lobster gear in Cape Cod Bay in 1984; (2) Fin whale entangled in lobster gear in Cape Cod Bay in 1984; (3) Fin whale entangled in gillnet in Massachusetts Bay in 1992, "swimming slowly and in an emaciated condition”; (4) Humpback whale entangled in gillnet in Cape Cod Bay in 1982; (5) Humpback whale entangled in gillnet in Cape Cod Bay in 1986, “with ropes and line wrapped around its body lashing its mouth shut”; (6) Humpback whale entangled in lobster gear in Cape Cod Bay in 1988; (7) Northern Right whale entangled in gillnet off Wellfleet, Massachusetts, in 1976; (8) Northern Right whale entangled in lobster gear in Cape Cod Bay in 1983; (9) Northern Right whale entangled in swordfish gillnet near the George’s Bank in 1993; the whale later died; and (10) Northern Right whale entangled in lobster gear off Plum Island, Massachusetts in 1984. (Complaint & Amended Complaint ¶¶ 40-49.)
 

 [32]
 

 .
 
 See
 
 16 U.S.C. § 1540(a)(1) (authorizing civil fine of $25,000 for knowing violation); 16 U.S.C. § 1540(b)(1) (authorizing criminal fine of $50,-000 and one year imprisonment for knowing violation).
 

 [33]
 

 . I do not, however, find application of the “rule of lenity” to be proper in this case.
 
 Cf. Babbitt v. Sweet Home Chapter of Communities for a Great
 
 Oregon, - U.S. -,- n. 18, 115 S.Ct. 2407, 2416 n. 18, 132 L.Ed.2d 597 (rejecting application of rule in facial challenge to FWS regulation and stating that ”[e]ven if there exist regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity, the [ESA regulation in which "harm” and “take” are defined to include habitat modification,
 
 see
 
 50 C.F.R. § 17.3], which has existed for two decades and gives a fair warning of its consequences, cannot be one of them”).
 

 [34]
 

 . The definition of "person” includes state officials such as the Defendants.
 
 See
 
 16 U.S.C. § 1532(13).
 

 [35]
 

 . These affidavits are found attached to CLF's amicus curiae brief. Strahan moved that these affidavits be reentered into the record on his behalf. I will thus consider them as part of Strahan’s submissions.
 

 [36]
 

 . Photographs attached to the Mayo Affidavit also show injuries to the whale from the lines. (Mayo Aff. ¶¶ 12-13; Mayo Aff.Att. A and B.)
 

 [37]
 

 . Whether the actual number is higher than the three known to be directly due to Massachusetts-permitted fishing gear is immaterial because "there are so few right whales that eveiy one that dies represents a significant reduction in the available gene pool necessary to assure viability of the species.” (Mattila Aff. ¶ 13.)
 

 In addition, I note that the ESA "does not distinguish between a taking of the whole species or only one member of the species. Any taking and every taking — even of a single individual of the protected species — is prohibited by the Act.”
 
 Loggerhead Turtle,
 
 896 F.Supp. at 1180 (citing 16 U.S.C. § 1538). The First Circuit also impliedly recognized this point in
 
 American Bald Eagle.
 
 There, the First Circuit found that there was
 
 “no
 
 evidence that
 
 any
 
 eagles at Quabbin actually ingested lead slug or that
 
 any
 
 eagles ate deer carrion containing lead slug.”
 
 American Bald Eagle v. Bhatti, 9
 
 F.3d 163, 166 (1st Cir.1993) (emphasis added). The First Circuit's rejection of the statement "that a one in a million risk of harm is sufficient to trigger the protections of the ESA” is not to the contrary. The issue there was the risk of
 
 future
 
 harm to an endangered species and the absence of
 
 any
 
 evidence of actual harm.
 

 [38]
 

 . I also note that implicit in the
 
 American Bald Eagle
 
 decision is that a state agency can “take" an animal, in violation of § 9 of the ESA, through its regulatory actions.
 

 [39]
 

 . The Supreme Court in
 
 Sweet Home
 
 stated that the ESA contained “ordinary requirements of proximate causation and foreseeability” and “ 'but for' causation.”
 
 See Sweet
 
 Home, - U.S. at - n. 13, 115 S.Ct at 2414 n. 13;
 
 id.
 
 at -, 115 S.Ct. at 2419-20 (O'Connor, J., concurring).
 

 [40]
 

 . I note that the designation of a critical habitat for an endangered species
 
 has no direct effect on state officials
 
 such as the Defendants. Rather, the federal government’s designation of a critical
 
 *987
 
 habitat implicates only certain duties and responsibilities of federal officials. 16 U.S.C. § 1536(a);
 
 see also
 
 Proposed Rule, Designated Critical Habitat; Northern Right Whale, 58 Fed. Reg. 29,186, 29,187 (proposed May 19, 1993) (final June 3, 1994, 59 Fed.Reg. 28,793) (stating that critical habitat designation "applies only to actions with Federal involvement e.g., authorized, funded, conducted), and does not affect exclusively state or private activities”).
 

 I do not, however, read Strahan’s Complaint so narrowly. Strahan’s Complaint alleges that because Northern Right whales intensively use the designated critical habitat area, the presence of fishing gear in this area is a modification of that habitat that "results in enhance[d] risk to the species from adverse activities that would not be as significant else[ ]where.” (Complaint ¶ 57.)
 
 See also
 
 Proposed Rule, Designated Critical Habitat; Northern Right Whale, 58 Fed.Reg. at 29,187 (stating that "critical habitat designation contributes to species conservation primarily by identifying critically important areas and by describing the features within the areas that are essential to the species, thus alerting public and private entities to the importance of the area").
 

 [41]
 

 . "Harm” can include "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.” 50 C.F.R. § 17.3(c) (West 1995).
 

 [42]
 

 . Injunctive relief cannot issue based solely on the possibility that an endangered species
 
 might
 
 be disturbed. A plaintiff must show actual harm or harassment.
 
 See American Bald Eagle v. Bhatti,
 
 9 F.3d 163, 166 (1st Cir.1993).
 

 [43]
 

 . Under the traditional test, a court will consider the following four factors in determining whether to issue a preliminary injunction:
 

 1. The likelihood of success on the merits; 2. The potential for irreparable injury; 3. The
 
 *989
 
 balancing of the relevant equities (most importantly, the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld); and 4. The effect
 
 on
 
 the public interest of a grant or denial of the restrainer.
 

 Narragansett Indian Tribe v. Guilbert,
 
 934 F.2d 4, 5 (1st Cir. 1991) (citations omitted).
 

 [44]
 

 . This presumably will allow ship traffic and fixed gear fishermen to avoid areas where endangered whales have been spotted.
 

 [45]
 

 . As part of the Marine Mammal Protection Act Amendments of 1994, Congress enacted a comprehensive provision governing incidental takes of marine mammals in commercial fishing operations.
 
 See
 
 Pub.L. No. 103-238, § 11, 108 Stat. 532, 546-57 (1994) (codified at 16 U.S.C. § 1387). The Endangered Species Act and the MMPA both apply to the incidental taking of endangered marine mammals through commercial fishing operations.
 
 See
 
 16 U.S.C. § 1387(a)(2). In particular, “[e]xcept as otherwise provided in [the ESA], no provision of [the ESA] shall take precedence over any more restrictive conflicting provision of the Marine Mammal Protection Act____" 16 U.S.C.A. § 1543 (West 1995).
 

 I recognize that in correspondence with the Defendants, NMFS has offered an advisory view that “it does not anticipate issuing any incidental take authority ... with respect to right whales.” Second Aff. of Philip G. Coates, Ex. A (May 28, 1996 Letter of Rolland A. Schmitten, NMFS, Ass't Administrator for Fisheries.) Mr. Schmitten’s letter also asserts in a conclusoiy fashion it is “inappropriate and unnecessary for the Commonwealth of Massachusetts to apply for a small take permit,” apparently on the premise that takings authorizations are "issued to participants in commercial fisheries, rather than to a state licensing agency.”
 
 Id.
 

 In order to crystallize the issues efficiently and formally, however, I will require that the Defendants make the applications, irrespective of the NMFS advisory opinion. It would appear unwieldly as an alternative to inundate NMFS with individual applications by commercial fisheries as a condition to obtaining a license from the Commonwealth. Moreover, it is by no means clear that the NMFS advisory position is well-founded. I note in this connection that the Plaintiff has just filed suit against NMFS,
 
 Strahan v. Kramek, et al.,
 
 Civil Action No. 96-11898-DPW, contending that, as with the Defendants in this case, NMFS has violated its duties under the ESA and MMPA.
 

 [46]
 

 . I note, for example, that the scientific affidavits suggest a number of proposed modifications, including the retrieval of ghost fishing gear from critical habitat areas,
 
 {see
 
 Mattila Aff. ¶ 16), and the attachment of noise makers to gillnets,
 
 {see
 
 Dorsey Aff. ¶ 41).
 

 I also note that the fishing industry in Massachusetts coastal waters is extensively regulated by NMFS, and by the New England Regional Fishery Management Council, under the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801
 
 et seq., see also
 
 50 C.F.R. pt. 601. In accordance with such regulation, several gillnet bans have been added to the Fishery
 
 *991
 
 Management Plan for the Northeast Multispecies Fishery,
 
 see generally
 
 50 C.F.R. pt. 651, subpt. A.
 

 In March of 1994, NMFS amended the Fishery Management Plan to restrict the use of sink gillnets in Massachusetts waters.
 
 See
 
 59 Fed. Reg. 9,872, 9,881 (Mar. 1, 1994). NMFS closed several areas to sink gillnets and/or other forms of fishing. “Closed Area I,”
 
 see
 
 Figure 3 to 50 C.F.R. pt. 651, is closed to sink gillnets from February through May. 50 C.F.R. § 651.21(a), as amended by Framework 9, 60 Fed.Reg. 19,-364, 19,376 (April 18, 1995). “Closed Area II” is closed to all fishing, except lobster and scallop fishing, from January through June. 50 C.F.R. § 651.21(b), as amended by 60 Fed.Reg. at 19,-376.
 

 Sink gillnets may not be used in the “Northeast Closure Area,”
 
 see
 
 Figure 4 of 50 C.F.R. pt. 651, from August 15 through September 13, in the "Mid-coast Closure Area” from November 1 through November 30, or in the “Massachusetts Bay Closure Area” from March 1 through March 30 of each fishing year.
 
 See
 
 50 C.F.R. § 651.32(a). These provisions may be modified in accordance with certain “framework adjustment” procedures.
 
 See
 
 50 C.F.R. § 651.32(b).
 

 Although the primary purpose of the gillnet regulations was to protect the Harbor Poipoise,
 
 see, e.g.,
 
 59 Fed.Reg. at 9,881, some consideration also was given to the needs of the Northern Right whale. In commenting on the proposed regulations, the Marine Mammal Commission suggested that the critical habitat areas for the Northern Right whales, which had been proposed but not adopted at the time, be used to define the closed areas.
 
 Id.
 
 NMFS responded:
 

 Much of the proposed critical habitat is already included in Closed Area I and the closure occurs at a time when right whales are present in the area. The Biological Opinion prepared for this amendment determined that Cape Cod Bay and the Great South Channel will not be adversely affected by the Amendment 5 measures. If the proposed critical habitat for right whales becomes final, it may be appropriate at that time to consider such a change under the framework provisions, in subpart C.
 
 The exception to this would be Cape Cod Bay, which is under the Commonwealth of Massachusetts' jurisdiction.
 

 Id.
 
 (emphasis added). Thus, the Defendants should also consider whether areas under its jurisdiction should be closed to certain 1ypes of fishing gear during appropriate times of the year.
 

 [47]
 

 . I note in this connection the apparent success of the Harbor Porpoise Working Group, which included scientists, state and federal agencies, environmentalists, gillnetters, and resource managers. (Dorsey Aff. ¶¶ 37-42.)
 

 [48]
 

 . The MMPA requires that stock assessment reports of marine mammal species be prepared by the Secretary [of the department in which the National Oceanic and Atmospheric Administration is operated] in consultation with the appropriate regional scientific review group.
 
 See
 
 16 U.S.C. § 1386(a). When a final assessment report is issued for a strategic stock, defined as a species which is listed as a threatened species or endangered species under the Endangered Species Act,
 
 see
 
 16 U.S.C. § 1362(19)(C), the Secretary is to establish a Take Reduction Team within 30 days.
 
 See
 
 16 U.S.C. § 1387(6)(A).
 

 [49]
 

 . Regional Scientific Review Groups (“RSRG”) are to consist of "individuals with expertise in marine mammal biology and ecology, population dynamics and modeling, [and] commercial fishing technology and practices----” 16 U.S.C. § 1386(d). Moreover, to the extent possible, the RSRG should represent "a balanced representation of
 
 viewpoints____” Id.